IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

John Joseph MERZBACHER,      :
     Plaintiff

    v.                        :   Civil Action Nos. AMD 07-67
                                       AMD 06-516
BOBBY SHEARIN, WARDEN, et al.,
     Defendants          :
                          ...o0o...

## MEMORANDUM OPINION

Petitioner John Joseph Merzbacher was convicted by a jury in the Circuit Court for
Baltimore City of child rape and related offenses and is serving, concurrently, multiple life
sentences. In this action, he seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.
Merzbacher alleges, *inter alia*, that he was denied the effective assistance of counsel
guaranteed by the Sixth and Fourteenth Amendments. Specifically, he alleges that each of his
two trial attorneys failed to tell him about, and failed to counsel him fully as to his options in
connection with, a pre-trial offer of a plea agreement tendered by the state in which the state
agreed to recommend, and a judge of the Circuit Court had agreed to impose, a sentence of
ten years incarceration (hereinafter, "the ten-year offer" or "the offer").[1]

---

[1]As one court aptly stated:

> Where defense counsel has failed to inform a defendant of a plea
> offer, or where defense counsel's incompetence results in a defendant's
> deciding to go to trial rather than pleading guilty, the federal courts have
> been unanimous in finding that such conduct constitutes a violation of the
> defendant's Sixth Amendment constitutional right to effective assistance of
> counsel. *Turner v. Tennessee*, 858 F.2d 1201, 1205-09 (6th Cir. 1988),
> *vacated and remanded on other grounds*, 492 U.S. 902, 109 S.Ct. 3208, 106
> L.Ed.2d 559 (1989); *Johnson v. Duckworth*, 793 F.2d 898, 900-902 (7th
> Cir.), *cert. denied*, 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986);

At the conclusion of an eight-year state post-conviction proceeding, which included an evidentiary hearing extending over several days and an appeal to an intermediate state appellate court (which remanded for further factfinding by the post-conviction court), the state post-conviction court denied relief. In denying Merzbacher's claim, the state post-conviction court relied on information outside the proceeding's evidentiary record in finding that one of Merzbacher's attorneys, now deceased, had a reputation for dishonesty. Based on counsel's reputation, the court found that the lawyer was a liar and that she committed perjury in her testimony during the post-conviction hearing when she testified under oath that she had failed to advise Merzbacher of the ten year offer or to discuss it with him.[2] Consequently, the court made a finding, which it acknowledged was contrary to all the direct evidence of record, that counsel advised Merzbacher of the ten-year offer. Furthermore, upon the remand of the case by the intermediate state appellate court, the post-conviction court found, without taking additional evidence, that counsel had fully discussed the offer with Merzbacher and that a fully-informed Merzbacher had rejected it.

---

*United States ex rel. Caruso v. Zelinsky*, 689 F.2d 435, 438 (3rd Cir.1982); *Williams v. Arn*, 654 F.Supp. 226, 235-37 (N.D.Ohio 1986), *vacated and reinstated nunc pro tunc to reflect later filing date*, 654 F.Supp. 241 (N.D.Ohio 1987), *appeal dismissed as untimely filed*, 856 F.2d 197 (6th Cir.1988), *cert. denied*, 488 U.S. 1044, 109 S.Ct. 873, 102 L.Ed.2d 996 (1989); *United States v. Bowers,* 517 F.Supp. 666, 671-72 (W.D.Penn.1981). S*ee also, State v. Simmons*, 65 N.C.App. 294, 300-301, 309 S.E.2d 493 (1983); *Lyles v. State*, 178 Ind.App. 398, 382 N.E.2d 991, 993 (1978); *People v. Whitfield*, 40 Ill.2d 308, 239 N.E.2d 850 (1968).

*Barentine v. United States*, 728 F.Supp. 1241, 1252 (W.D.N.C. 1990), *aff'd without op.*, 908 F.2d 968 (4th Cir. 1990) (table).

[2] The post-conviction court concluded that the second attorney had no such duty.

The principal issues presented before this court are procedural and substantive. Procedurally, the questions presented are: (1) whether Merzbacher has clearly and convincingly rebutted the presumption of correctness that attends the state post-conviction court's findings that (a) his counsel advised him of the state's offer of a plea agreement and (b) his counsel fully informed him of his options in deciding whether to accept or reject the offer, *see* 28 U.S.C. § 2254(e)(1); and (2) whether the state post-conviction court's "decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *See* 28 U.S.C. § 2254(d)(2). Substantively, if but only if Merzbacher succeeds on the procedural issues, the questions presented are: (1) whether Merzbacher has shown that his attorneys provided constitutionally deficient assistance; and, if so, (2) whether their deficient performance prejudiced him, that is, whether he has shown " a reasonable probability" that, but for counsels' "unprofessional errors," he would have pled guilty rather than proceed to trial. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).

The court has held a non-evidentiary hearing and counsel for the parties have filed extensive memoranda. The court has carefully pondered the matter in light of the parties' contentions, mindful of the heightened deference it must accord to state court decisions such as the one at bar, deference that federal law explicitly mandates in habeas claims instituted pursuant to 28 U.S.C. § 2254. For the reasons set forth within, the court finds and concludes that Merzbacher has carried his heavy burden to establish a right to relief. Accordingly, the court shall grant the writ. Specifically, the court shall order the state to return the case to the

*status quo ante* and afford Merzbacher an opportunity to accept or reject its prior offer of a plea agreement. As explained within, however, before Merzbacher gains full relief, a judge of the circuit court must express a willingness to carry out the undertaking of his or her former colleague who bound himself, but perhaps not the court as a whole, to impose a sentence of ten years incarceration should Merzbacher elect to plead guilty pursuant to a fully negotiated plea agreement.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. Merzbacher's Offense Behavior

Merzbacher was indicted in the Circuit Court for Baltimore City on three counts of carnal knowledge of a female child under the age of 14 years, one count of perverted practice, one count of rape, and one count of sexual child abuse. The victim of his offenses was Elizabeth Murphy. The Maryland Court of Appeals summarized the background of the prosecution as follows:

> Joseph Merzbacher and Elizabeth Murphy first encountered each other in 1972 when Merzbacher was a teacher at the Catholic Community Middle School of Baltimore ("CMMS"). Murphy, who was eleven years at the time, was his student. According to Murphy, Merzbacher subjected her to three years of sexual, physical, and emotional violence. The torment ended when Murphy left CCMS in 1975. She did not reveal the substance of these attacks to anyone for some time. In 1979, she informed Sister Eileene Weisman of Merzbacher's behavior, but to no avail. She did so again in 1988, again without result. That same year Murphy sought advice from Father William Mannion, a former classmate of hers at CCMS. Mannion agreed to speak with Murphy at length about her experiences with Merzbacher. After doing so, Mannion reported the incidents to officials of the Archdiocese of Baltimore.

*See Merzbacher v. Galley*, 697 A.2d 432, 434-35 (1997) (footnotes omitted).

B.  The Failed Plea Offer, Trial and Appeal

The ten-year offer surfaced in the following manner. At the conclusion of one of several pretrial motions hearings, in December 1994, counsel for Merzbacher and prosecutors from the Office of the State's Attorney for Baltimore City met, in the absence of Merzbacher, in the chambers of the then presiding judge, the Honorable Clifton T. Gordy.  It is undisputed that during this session, the prosecutors offered to Merzbacher through his lawyers, Christina Gutierrez (Merzbacher's retained counsel and the lead attorney) and William Kanwisher (Merzbacher's assigned public defender), an opportunity to plead guilty in consideration for which the prosecutors would recommend a sentence of ten years of incarceration.[3] *See* Transcript of August 10, 2004, at 26. Specifically, the offer would have permitted Merzbacher to plead guilty to an unspecified number of indictment counts and receive a ten-year sentence in exchange for the state's *nolle proesequi* of an additional 15 or 16 indictments. It is undisputed that in the course of the December 1994 chambers conference, Judge Gordy bound himself to impose such a sentence. No plea agreement was ever consummated and, indeed, the record discloses that there was never a discussion of any plea agreement between or among counsel ever again.

---

[3]The reason Merzbacher enjoyed the services of both retained counsel as well as an attorney from the office of the public defender is explained in the record. After he was initially indicted for the rape of Elizabeth Murphy (in connection with which Merzbacher retained Gutierrez) additional victims came forward and the state's attorney obtained more than ten additional indictments. Merzbacher then qualified financially for appointed counsel. Understandably, retained and appointed counsel elected to collaborate in their representation of Merzbacher in the first case chosen by the state to take to trial.

The case went forward to trial before a jury presided over by the Honorable Robert I. H. Hammerman.[4] The jury convicted Merzbacher on all counts on June 8, 1995. Merzbacher's motion for a new trial was denied on July 21, 1995, and he was sentenced to four concurrent life terms, with an additional ten-year term to run concurrently.

On direct appeal, Merzbacher raised the following claims:

1. Whether the trial court propounded an erroneous reasonable doubt instruction;
2. Whether the trial court committed prejudicial error in its admission of "bad acts" evidence;
3. Whether the trial court committed prejudicial error when it excluded evidence favorable to the defense; and
4. Whether the trial court failed to conduct an adequate voir dire.

Rejecting these assignments of error, the Court of Special Appeals of Maryland affirmed the judgment in an unreported opinion. Thereafter, the Court of Appeals of Maryland granted Merzbacher's petition for *certiorari* as to the following three issues: (1) the reasonable doubt instruction; (2) admission of the "bad acts" evidence; and (3) exclusion of favorable evidence. On July 28, 1997, the Court of Appeals affirmed the judgment of the Court of Special Appeals. *Merzbacher v. State*, 697 A.2d 432 (Md. 1997).

C.  The State Post-Conviction Proceedings

On July 20, 1998, Merzbacher filed a petition for post-conviction relief in the circuit court.  In his petition, Merzbacher argued, *inter alia*, that his attorneys, Gutierrez and Kanwisher, provided constitutionally ineffective assistance when they failed to convey the

---

[4]At the time the trial began in June 1995, Judge Gordy was no longer assigned to the felony trial docket of the circuit court.

ten-year offer to him and when they failed to advise him fully as to his options in respect to the ten-year offer.

The case was assigned to the Honorable William D. Quarles, who heard preliminary matters in the post-conviction proceeding. The state filed a motion for recusal of Judge Quarles and in April 2000, Judge Quarles granted the motion and recused.[5]  The matter was reassigned to the Honorable John N. Prevas.  The court held evidentiary hearings and, eventually, oral argument, on several dates between October 31, 2000, and February 1, 2001.  During the hearing, the court heard testimony regarding: (1) whether the state actually extended the ten-year offer to Merzbacher (through his attorneys); (2) whether Merzbacher's attorneys failed to convey the offer to Merzbacher for his consideration; (3) whether

---

[5]In the Motion for Recusal, the State's Attorney for Baltimore City alleged that in an unrelated criminal case in which Gutierrez represented defendant Adnan Syed before Judge Quarles, Judge Quarles had accused Gutierrez of lying, apparently within the hearing of one of the jurors. That juror allegedly passed a note to Judge Quarles asking, "In view of the fact that you have determined that Ms. Gutierrez is a liar, will she be removed [from the case] and we start over?"  The State's Attorney further alleged that thereafter Judge Quarles had declared a mistrial. In support of its motion, the State's Attorney alleged that Gutierrez would be called as a witness for the state in the post-conviction hearing and that the state was concerned that Judge Quarles would be influenced inappropriately by his interactions with Gutierrez in the *Syed* matter. Merzbacher, Ex. 9 at ¶ 8-10. As discussed in text, Judge Quarles's allegation that Gutierrez had "lied" and his subsequent recusal from the Merzbacher post-conviction proceeding played a large role in the factual determinations rendered by the reassigned judge.

It should be noted that it is not at all unusual for the prosecution to call as its witness counsel for the accused in a post-conviction proceeding such as the one at issue here. Indeed, several of Merzbacher's claims of ineffective assistance of counsel related to tactical and strategic decisions made by counsel, e.g., whether to seek a change of venue and whether to call a named witness. As to those issues, the prosecution most assuredly wanted to have defense counsel testify and to have counsels' testimony credited by the post-conviction court. None of the additional claims of ineffective assistance alleged by Merzbacher in the post-conviction proceeding are before this court under § 2254.

Merzbacher's attorneys fully and accurately advised Merzbacher of his options in deciding whether to accept or reject the ten-year offer; and (4) whether Merzbacher could show there was a "reasonable probability" that he would have accepted the offer and pled guilty had he been fully advised of his options. The substance of the testimony is set forth below and throughout this opinion.

1. Testimony by the Principals

Gutierrez, Kanwisher, Judge Gordy and Roberta Siskind, one of the Assistant State's Attorneys who prosecuted the case, all testified in the post-conviction proceeding and each confirmed, without equivocation, that the ten-year offer was extended to Merzbacher through his attorneys.[6] Assistant State's Attorney Siskind testified as follows, in part:

> Q:  Ms. Siskind, there's no question in your mind though that the State conveyed a plea agreement to the Defense. Is that correct?
> A:  I don't know --I don't really know how to characterize this because it was more of a way of starting a discussion but yes, we said - the Judge said to us, what amount of time are you thinking of? We said ten years for a group of cases if he plead guilty to them.
> Q:  And had Mr. Merzbacher been present and walked in to the room that day and said, yes, I accept to enter a plea of guilty and accept a ten year sentence, the plea would have been consummated at that time, correct?
> A:  Well, I think there would have been a little more. We would have had to sit down and decide exactly which ones he would have been pleading to, but yes.
> Q:  And as a result of that plea, it would have eliminated all of the cases.
> A:  Correct.

---

[6]The second (and lead) Assistant State's Attorney who represented the state in the Merzbacher prosecution did not testify because she represented the state in the post-conviction proceedings.

Transcript of November 9, 2000, at 65:23-64:16.

Judge Gordy testified as follows, in part:

Q:    Do you recall what it is you said that actually got the discussion under way?
A:    I think I said to the State, had they made any offers in this case to the Defense in reference to a plea and I think that's what initiated this discussion which was not a long, all night discussion, but that initiated a discussion.
Q:    And in response to your question, what did you hear?
A:    The Assistant State's Attorney, who at the time was Ms. May, in the presence of Ms. Siskind said that the State had considered or would consider an offer of ten years in prison.
        . . . .
Q:    What, if any, details were worked out regarding the parameters of the plea?  I know you said ten years, but ten years to what?  How was it structured?
A:    I don't remember any discussions as to structure. The ten years was, kind of, out there and I never heard back from anyone and the end of the term came and the case went to trial.

Transcript of November 9, 2000, hearing at 77:13-25; 81:4-10.

Gutierrez testified as follows, in part:

Q:    Now, was there a plea offered to you by the State in this case?
A:    There was a plea offered.  I guess I'd rather characterize it as that it was put on the table clearly by Judge Gordy after consultation with us and the State.  The number did not emanate from the State but they essentially agreed to the offer that was made.
Q:    So Judge Gordy was participating.  He was playing as how would you describe his role as being active in trying to broker a plea between the State and the Defense in this case?
A:    Yes.  Very much so, particularly in light of the issue of severance having -- or at least us viewing it, as having certainly lite (sic) a fire under everyone to see if they could find a way.
Q:    And what was the plea that was ultimately brokered or suggested by Judge Gordy that was acquiesced to by the State that was conveyed to you as a result of all of those discussions?  What was your understanding of what that plea was?

A:    It was a plea to one, I think it was one Count, it might have been two Counts, to rape and child abuse in the Liz Murphy case for ten years. And that all of the other cases, however many there were, fifteen or sixteen of them would all be nol prossed.

Q:    Now as a criminal defense attorney, did you interpret this to be a firm offer made by the State to you?

A:    Yes

Transcript of October 31, 2000, hearing at 20:18-21:21.

Kanwisher testified as follows, in part:

Q:    Now, after the case got started, the venue was determined and some time prior to trial, were there any plea negotiations in this case?

A:    There was a conference in Judge Gordy's chambers, specifically.

Q:    And was a plea offer extended to the defense by the State in this case?

A:    Yes.

Q:    And what was your understanding of the plea that was being offered by the State to the Defense?

A:    Well, the State was proceeding upon a case involving an alleged victim called Elizabeth Murphy. That was their first choice of cases to try. And, as I recall, it was after one of the motions hearings that we had there in chambers, and there was a discussion about whether or not the case could be plead out, or actually all of the cases. I believe, I don't hold me to this, but I think it was 16 separate cases, and whether a resolution could be reached regarding all of those. . . And ultimately the plea was that Mr. Merzbacher, if he chose to, would plead guilty to the Elizabeth Murphy case, receive a sentence of ten years, and all of the remaining cases would be nol prossed. And that was my understanding of the plea offer.

Q:    Now, as a defense attorney, you're aware of the difference between plea negotiations and a plea offer, are you not?

A:    Yes.

Q:    And, in this instance, how would you characterize the result of your discussions? Were they a plea offer or plea negotiations?

A:    It was an offer, because of the way it was left at the end, it clearly was, the ball clearly was in our court. There was an understanding of, I took away from the meeting an understanding that it was, like okay, there we are. And then Ms. Gutierrez and I were in a sense, it seems to me, it was communicated clearly to us that now we were to act on this. And,

that was my clear understanding of what had happened by the end of that meeting.

Transcript of October 31, 2000, hearing at 58:17-60:14.

As set forth above, and as found by the post-conviction court, *see* Transcript of August 10, 2004, at 26:19-20 ("THE COURT: . . . I indicate in the opinion there was an offer, there just wasn't an agreement.") it is undisputed that the state made the ten-year offer. Thus, to a very significant extent, Merzbacher's entitlement to state post-conviction relief hinged on whether his attorneys conveyed the ten-year offer to him and, equally important, whether they adequately advised him of his options in respect to the ten-year offer. *See* cases cited *supra* n.1.

Both Gutierrez and Kanwisher testified, unequivocally, that neither of them ever counseled Merzbacher regarding his options and the advisability of accepting or rejecting the ten-year offer. In fact, according to their testimony, neither of them ever even told Merzbacher about the ten-year offer. Essentially, counsel rejected the offer without input from their client. Gutierrez gave the following testimony regarding the reasons for her failure to inform Merzbacher of the ten-year offer:

> Q:	And what prevented you from conveying this plea to Mr. Merzbacher?
> A:	Well, I can't quite point to one thing.  That's why I think it [i.e., the meeting in Judge Gordy's chambers] was around the same time.  On January 15, without planning whatsoever, I was forced to move my law office, literally overnight.  And that created a great burden on me.  Also in January I was in the middle of hearings in front of Judge Ferris, an administrative law judge in Anne Arundel County in the case against Laurie Cook.  Those hearings took well over 200 hours and had been started about the second week of December.
> . . . .

A:  And those hearings, because it took me literally 200 hours, was backing me up to the wall. And I had recently concluded the case of Jacqueline McClean, whose hearings ended I think on the 18th of December. So, I was under a tremendous amount of stress, being forced to literally move overnight to a new place and reset up my practice in the middle of keeping going what I was keeping going, was very stressful. I have no recollection of telling Billy Kanwisher to do it. I 'm sure I thought that I should have told him. And it was in my mind, but it's clear to me that I didn't do that. And I assumed that he did. And the next several months were very hectic for me just trying to keep my own practice going.

Transcript of October 31, 2000, hearing at 22:20-23:23.

Kanwisher explained his inaction this way, in part:

A:  The dynamics of the situations were that Ms. Gutierrez was not only the lead counsel, she was the chosen counsel of Mr. Merzbacher. And, I was in some respects, I came late to the case and I was the Public Defender, an appointee. To go [sic] Mr. Merzbacher and persuasively recommend him to take that particular plea, which, at the time, I though [sic] should have been done, I was not in the best position to be the most persuasive member of the defense team to do so.
. . . .
Q:  During the course of this case you and Ms. Gutierrez actually consulted about what your role would be, what her role would be, correct?
A:  Yeah, I mean in a . . . There wasn't ever a list or - I mean it was sort of understood. And I would do most of the grunt work and she would do most of the court work. I mean that was the basic delineation of tasks.
. . . .
Q:  Can you recall whether they were say, any major decisions which you actually made in the case as opposed to say Ms. Gutierrez
A:  No.
Q:  It was always something that the two of you worked out together?
A:  At least. *We communicated pretty well at the time. And yeah, we pretty much discussed every, I would think major decision in the case.*

Transcript of October 31, 2000, hearing at 61:2-10; 65:23-66:5, 67:14-69:11 (emphasis added).

2. The First Post-Conviction Opinion

After the evidentiary record closed, the post-conviction court did not issue its findings of fact and conclusions of law for more than two years. Finally, on or about April 1, 2003, the court denied Merzbacher's petition in a memorandum opinion and order filed on that date.[7]

In its opinion, the post-conviction court first focused on *Williams v. State*, 605 A.2d 103 (Md. 1992), an important state post-conviction case.[8]  In *Williams*, the Maryland Court of Appeals, applying *Strickland*, held that the defendant was denied the effective assistance of counsel guaranteed by the federal and state constitutions. Williams and a codefendant, Alton D. Grimes, Jr., were charged with kidnapping and other offenses; they were represented by the same lawyer. At the commencement of the trial, the state offered both defendants a plea agreement pursuant to which the defendants would plead to an indictment count for which the maximum sentence was ten years.  When defense counsel advised the defendants of the plea offer, Grimes "adamantly refused it," and Williams stated that he

---

[7]As described *infra*, the body of the 2003 memorandum opinion was slightly edited and the opinion was supplemented with an eight page addendum after the remand to the post-conviction court by the intermediate state appellate court in 2006. Citations to the body of the memorandum opinion will be designated as "2006 Op." and the supplemental memorandum and order signed on or about June 20, 2006, and docketed on or about June 26, 2006, will be cited as "2006 Supp. Op."

[8]After citing this authority, the post-conviction court simply cut and pasted 24 pages of secondary sources into the opinion. The pasted text was from the following articles: Gregory G. Sarno, Annotation, *Adequacy of Defense Counsel's Representation of Criminal Client Regarding Plea Bargaining*, 8 A.L.R. 4th 660 (1981); Steven Zeidman, *To Plead or Not to Plead: Effective Assistance and Client-Centered Counseling*, 39 B.C. L. Rev. 841, 863-76 (1998).

"wanted to do what Mr. Grimes would." (Grimes had retained the attorney and was paying the legal fees for both defendants.) *Id.* at 108.

At the time the plea agreement was offered, defense counsel did not know, although he had reason strongly to suspect, that Williams, if convicted, was subject to the state "three time loser" law. In fact, upon Williams's conviction after a jury trial, the state filed the appropriate notice of enhanced punishment and Williams received a sentence of 25 years. The circuit court subsequently granted Williams post-conviction relief based on its finding that Williams had been denied the effective assistance of counsel because his counsel failed to advise him of the possibility of the enhanced sentence, thereby depriving Williams of important information bearing on the advisability of his acceptance or rejection of the state's plea offer. The Maryland Court of Special Appeals reversed the post-conviction court in an unreported opinion, apparently on the theory that the plea offer had been a "take it or leave it offer" to Grimes and Williams jointly, and inasmuch as Grimes rejected the offer, there was no opportunity for Williams to accept it. That being so, the intermediate appellate court concluded, Williams suffered no prejudice under a *Strickland* analysis.

The Court of Appeals granted Williams's petition for *certiorari*, reversed the judgment of the intermediate appellate court, and remanded the case to the circuit court with directions that Williams be permitted to accept the foregone plea agreement. The Court of Appeals unhesitatingly rejected the intermediate appellate court's speculation that the offer of a plea agreement had been a joint offer, incapable of acceptance by Williams alone, because the record contained no evidence to support that assertion. Thus, the court proceeded to

evaluate the *Strickland* claim. In so doing, the Court of Appeals cited to the plethora of federal and state cases which stand for the unremarkable proposition that, "[a] trial attorney performs deficiently when he or she does not disclose to the client that the State has made a plea offer." *Id*. Further the court cited to such cases holding that deficient performance is also shown where "a trial attorney who, while disclosing the plea offer, provides the defendant with incomplete or misleading information with regard to the offer." *Id*. The court found that counsel had provided deficient performance in his representation of Williams.

The Court of Appeals then examined the issue of prejudice, the second prong of a *Strickland* claim. The court stated: "Whether prejudice actually occurs requires consideration of the proof offered by the client regarding what would have been done with proper and adequate advice." *Id.* at 109. Ultimately, the court concluded that "the evidence of prejudice in this case is ample." In so holding, the court reasoned as follows:

> Unlike the State, the petitioner does not believe that in order to prevail, it is necessary that the record contain "objective" evidence that he was prejudiced, that is, that he would have accepted the plea agreement offered by the State. He endorses the position enunciated in *People v. Pollard*, *supra*, 282 Cal.Rptr. at 594,: "[t]he defendant must show that but for the failure to convey the offer or to misadvise concerning the law, it is reasonably probable that the defendant would have accepted the offer." On the other hand, it is enough, the petitioner asserts, that "counsel's failure to inform the petitioner of the consequences of going to trial precluded him from making a knowing and intelligent decision to accept the offer." In other words, it is his inability to make an informed choice that is the critical fact, not whether, on an objective basis, he would have reached a different conclusion. In either case, the petitioner maintains that we need not look for "objective" evidence of his intention. All that is required is that the totality of the evidence supports an inference that the outcome "may well" have been different had he been fully and accurately informed.

There are cases that eschew "subjective, self-serving" statements by a defendant, instead looking for, and relying on, objective evidence that the defendant would have acted differently upon being apprised adequately of the situation . . . .  Other courts have refused to characterize the evidence required to show prejudice as either "subjective" or "objective" and have looked to the "facts of each case" to see if "there is at least an inference from the evidence" that such prejudice exists . . . . [Some cases] characterize[] those cases as simply presuming prejudice from the fact that acceptance of a plea offer available to the defendant would have resulted in more favorable treatment than he or she actually received. These cases may be viewed, and we so view them, as focusing on an important fact from which the inference could be drawn that the defendant with more, or better, information, would have acted differently. In any case, the attempt is to determine whether, but for the deficient performance by counsel, there is a substantial possibility that the defendant would have accepted the plea agreement.

In *Turner*, the "objective" evidence found sufficient was the defendant's response to a two year plea offer by proposing a one year counter offer and the lower court's finding that the defendant was under the control of his attorney, who, with only a slight change in his advice, could have ensured a plea. 858 F.2d at 1206. In *Lewandowski*, when previously clearly advised as to the consequences of going to trial, the defendant had pled guilty. The court viewed that fact as objective evidence that, "with competent legal counsel and advice, it is reasonable to believe that when faced with the real possibility of going to trial on first degree murder, petitioner would have changed his mind and withdrawn his appeal to vacate his plea." 754 F.Supp. at 1150.

In the case *sub judice*, t*he plea offer is certainly more favorable than the sentence the petitioner actually received. Furthermore, the record reflects that, when previously fully and accurately advised, in light of his criminal history, of the consequences of testifying, the petitioner following counsel's advice, elected not to testify. And the petitioner has, after the fact, indicated that had he been told of the possible mandatory sentence, he would have accepted the plea. Upon our independent constitutional appraisal of this record . . . it may be inferred that, had he been as clearly and fully advised concerning the potential mandatory sentence as he was concerning the consequences of testifying, the petitioner "may well" have opted to accept the plea agreement, i.e., there is at least a "substantial possibility" that the outcome would have been different. The inference is supported by "objective" evidence-the petitioner's prior acceptance of his counsel's advice to remain silent.*

*Id.* at 109-10 (some citations omitted; footnotes omitted; brackets and emphases added).

Inexplicitly, the Merzbacher post-conviction court did not find the Court of Appeals' analysis in *Williams* particularly helpful in its assessment of Merzbacher's claim. With respect, but in all candor, this court finds the post-conviction court's attempt to distinguish *Williams* largely incoherent:

> In *Williams*, the favorable offer was conveyed and accepted;[9] the prejudice arose from the state's inartful invocation of a mandatory sentencing statute to block one co-defendant for [sic] availing himself of the plea offer because the co-defendant wanted to go to trial, while the offer was not conditional on being contingent on both defendants accepting the offer. A differently worded offer would have avoided the prejudice found by the Court of Appeals in *Williams*. When the ontological status of either the existence (or ripeness) of an offer and/or the communication of a ripened offer to the client is at issue, it is inadvisable to take at face value the testimony of client and counsel that occurred in private, within the confines of the attorney-client privilege, as memories will invariably be clouded by wishful thinking.

2006 Opinion at 46. The post-conviction court then cites and quotes over four pages from some of the federal and state cases, many of them cited in *Williams, supra*, (and many of which actually cite *Williams*) which have examined the issue of whether and how the *Strickland* prejudice prong is best analyzed.

Finally, on page 51 of its 57 page 2006 Opinion, the post-conviction court turned to Merzbacher's claim and rejected it. The court made a series of findings which in combination pointed to its ultimate findings that neither Gutierrez nor Merzbacher testified truthfully

---

[9] This assertion is demonstrably untrue; Williams did not accept the plea offer in *Williams*, saying he "wanted to do what Mr. Grimes would." *See Williams*, 605 A.2d at 105.

when they testified that Gutierrez never disclosed the plea offer to Merzbacher and fully discussed it with him. The court stated:

> In the instant case, the only three factors that work in the Petitioner's favor are as follows:
> 1) The disparity between the sentence discussed in the plea offer and the ultimate sentence imposed;
> 2) [T]he fact that the Petitioner did not testify in his defense; and
> 3) [P]etitioner and counsel's testimony at the post conviction hearing that his plea offer was even [sic] conveyed.
>
> Each factor, standing alone, or without countervailing circumstances could generate the same result as *Williams supra*.

2006 Opinion at 51. Despite the above favorable findings supportive of Merzbacher's claim, the post-conviction court ultimately concluded that "viewing the totality of circumstances in this instance, even applying the *Williams-Napper* standard, it is impossible for this Court to conclude that Petitioner would have ever plead guilty to anything even if a nascent offer had ripened into a fully articulated plea agreement prior to trial." *Id*. That is, so far as this court is able to discern, the post-conviction court concluded that Merzbacher had failed to establish both the deficient performance prong as well as the prejudice prong of his Sixth Amendment ineffective assistance of counsel claim. This conclusion was based on the following subsidiary findings by the court, so far as this court is able to ascertain:

(1) Merzbacher "avidly and vociferously maintained his innocence," including to his wife; 2006 Op. at 45;

(2) No final plea agreement ever was reached;[10]

---

[10] This factor was important to the post-conviction court, which noted that the state would not have agreed to an *Alford* plea. *See North Carolina v. Alford*, 400 U.S. 25 (1970).

(3)  Merzbacher had been facing civil claims brought against him by his victims;

(4)  The state's case was not a strong case and Merzbacher had a "good chance of

successfully maintaining his defense;" *Id.* at 52;

(5)  Merzbacher's evidence offered "no cogent reason . . . as to why he would have

dramatically changed his strategy and accepted ten years in prison." *Id.*

But the conclusive factor for the post-conviction court was the credibility of Merzbacher's lawyer, Gutierrez.  The court found that Gutierrez committed perjury at the post-conviction hearing and lied on the stand "to protect Merzbacher:"

> It is with a very heavy heart that I must conclude that the Ms. Gutierrez, who shortly afterwards consented to disbarment and is now suffering terminally from the effect of uncontrolled diabetes and multiple sclerosis, (I wish I could have waited and been disrespectful to her posthumously) committed perjury in the post-conviction hearing. Sadly, she is simply not worthy of belief.  Her concern [sic] was riddled with controversies surrounding her lack of candor. See *In re Application of Maria C.*, 294 Md. 538 (1982) (Smith, J., dissenting). She was admitted to the bar despite a negative report by the character committee because she concealed two shoplifting convictions; the court explaining that she did so because she was depressed because she was a battered spouse.; [sic] she was accused of lying to Judge Quarles in the Adnan Syed case; she consented to disbarment and the Client Securities Trust Fund asserted claims of $325,000 in fees that Ms. Gutierrez accepted from clients and gave no service to in return). Sarah Koenig, *Attorney is Drawing Numerous Complaints*, The Baltimore Sun, July 19, 2001 at 1B, 2B., *Law Notes – Gutierrez Claims Grows*, The Daily Record, Sept. 24, 2001 at 1B.
> . . . .
> Regarding Ms. Gutierrez, who claimed at the post-conviction hearing that she forgot to tell Petitioner about the ten year offer because she had to move out of her office quickly, causing her to be disorganized (despite her meticulous presentation of a forceful defense at trial) and because she was consumed defending another teacher on sexual abuse allegations in Anne Arundel County.  In the Jackie McLean case, at about the same time, she maneuvered Judge Joseph Kaplan to reassign the case to Judge Donald Gilmore, so that she could get a binding offer of probation and avoid a jury trial with Judge Elsbeth

> Bothe. *If Ms. Gutierrez and Petitioner wanted to plead to ten years then, she had the manipulative skills to consummate it. Now, it appears there will be no willing takers.*

*Id.* at 52-53 (emphasis added). The post-conviction court stated, as to the ten-year offer: "I hold that it, as much of it as was fleshed out, was communicated, in private, despite assertions to the contrary, and was and would always have been rejected, but for the ultimate conviction and sentence." *Id*. at 55.

### 3. The Application for Leave to Appeal

On May 1, 2003, Merzbacher filed a timely application for leave to appeal to the Court of Special Appeals. Therein, Merzbacher argued that the post-conviction court violated Maryland Rule 5-201 ("Judicial Notice of Adjudicative Facts"), his constitutional right to confront witnesses, and his right to a full and fair hearing. He also alleged that the post-conviction court erred in concluding that he failed to establish that he had been deprived of effective assistance of counsel when his trial counsel failed to inform him of the ten-year offer.

The Court of Special Appeals of Maryland remanded the case to the post-conviction court without an opinion and without affirming or reversing the judgment. The court's order stated as follows, in full:

> IT APPEARING that the hearing judge found as a fact that trial counsel did inform the applicant of the State's guilty plea offer, but did not make any findings as to (1) what advice - if any - trial counsel actually gave applicant as to whether the plea should be accepted, and (2) whether counsel's advice - or lack therefore - constituted "ineffective assistance of counsel," it is this 11th day of March, 2004, by the Court of Special Appeals,

ORDERED that the captioned case be remanded without affirmance or reversal so that the circuit court can decide in the first instance the following two questions:

> 1.      Whether [Merzbacher] is entitled to post-conviction relief on the ground that trial counsel, Christina Gutierrez, failed to properly advise the applicant of his options regarding the guilty plea offer; and
>
> 2.      Whether [Merzbacher] is entitled to post-conviction relief on the ground that his trial counsel, William Kanwisher, failed to assure that the applicant was fully and properly advised of his options regarding the guilty plea offer?

(06-516, P. 3, Ex. 7).

4.  The Second Post-Conviction Opinion

Upon the remand, Merzbacher and the state filed supplemental memoranda and the post-conviction court held a non-evidentiary hearing on August 10, 2004, and the matter was submitted for decision.

By February 24, 2006, some 18 months after the case had been submitted, the post-conviction court had not issued its decision on the issues identified by the Court of Special Appeals. Accordingly, Merzbacher filed a 28 U.S.C. § 2254 application for habeas corpus relief in this court. (Case No. 06-516, the record of which is incorporated by reference herein.) Merzbacher argued that this court should excuse the exhaustion requirement based on the inordinate delay in the state post-conviction process. *See* 28 U.S.C. § 2254(b)(1)(B)(ii) (providing that a habeas petitioner does not have to exhaust state court remedies where "circumstances exist that render such process ineffective to protect the rights of the applicant").

Finally, on June 26, 2006, while Merzbacher's § 2254 petition was pending in this court, the post-conviction court reissued its 2003 Opinion with minor changes together with a supplemental opinion which again denied relief. The supplemental opinion was an eight page document which purported to address the issues identified in the remand order of the Court of Special Appeals.

In this second opinion, the post-conviction court found and concluded that Merzbacher was not entitled to post-conviction relief on the ground that Kanwisher provided ineffective assistance of counsel. The court found that Kanwisher was "out of the loop on the issue." The court reasoned that Kanwisher was not constitutionally ineffective because not every lawyer on a legal team has an equal obligation to inform the client of any reasonable plea offer, and in this case Gutierrez shouldered the responsibility:

> In relation to the issues as to whether his trial co-counsel, William Kanwisher, failed to assure that the applicant was fully and properly advised of his options regarding the guilty plea offer; Mr. Kanwisher testified at the post-conviction hearing that the nature of the relationship among himself, Gutierrez, and Merzbacher was that he was to assist at the trial with trial oriented tasks. He did not have sufficient privity with Merzbacher to undertake to second-guess Gutierrez and double check if she had conveyed any plea offer to Merzbacher. His testimony on that issue was essentially that he was out of the loop, as he was merely assisting Mr. Gutierrez.
> Although Maryland Rules of Professional Conduct, Rule 1.4, *Communication*, requires that counsel inform the client of any reasonable plea offer for consideration, it does not create a multiple, parallel obligation that each additional lawyer who joins the team retrace the steps and reassure himself and the client that all appropriate steps have been followed. Nothing in Rule 1.4 or cases that annotate it implies that the obligation applies to a single attorney or to an attorney unit, and each member of the attorney team, especially those non-lead attorneys with ancillary functions.
> Therefore, Mr. Kanwisher did not fail to provide ineffective assistance of counsel by not becoming involved with Ms. Gutierrez in the plea discussion

aspect of the representation or undertaking to individual cover the offer with the client himself. No violation of the effective assistance of counsel clause contemplated by *Strickland v. Washington*, 466 U.S. 688 (1984) is to be found here.

2006 Supp. Op. at 1-2.

The court next addressed whether Gutierrez failed to advise Merzbacher of his options regarding the plea offer. The court stated that "that subject matter is fairly covered by the memorandum of the court dated March 25, 2003 at pages 10-54 (especially at page 51)." *Id.* at 2. The court also summarized three findings of fact that it made in the prior opinion:

To summarize what was said [in the earlier opinion], this Court found the following facts:

1. Merzbacher engaged in wishful thinking when he testified at the post-conviction hearing that he was not apprised of the plea offer.
2. Kanwisher was out of the loop on the issue and cannot shed light on what occurred.
3. Gutierrez committed perjury at the post-conviction hearing when she testified that she never advised Merzbacher of the offer, that she was so busy managing her office that she forgot to, and that the subject of a guilty plea never came up.

*Because the Court believes neither Merzbacher nor Gutierrez with respect to this assertion, it draws the inference from the totality of the circumstances in the record that the offer was discussed and rejected.*[11]

*Id.* at 2-3 (emphasis added).

---

[11]This alleged "inference" was "drawn" in disregard of clear and long-settled Maryland law. *See In re Gloria H.*, 979 A.2d 710, 719 (Md. 2009) ("The jury's prerogative not to believe certain testimony . . . does not constitute affirmative evidence to the contrary.")(quoting *VF Corp. v. Wrexham Aviation*, 715 A.2d 188, 196 (1998); *and see id.* ("A refusal to believe evidence of a respondent, however, does not, of itself, supply affirmative evidence of the dishonesty, fraud, deceit or misrepresentation charged.") (quoting *Attorney Grievance Comm'n v. Clements*, 572 A.2d 174, 179 (Md. 1990).

The court then undertakes to justify its reliance on non-record "facts" in finding that Gutierrez committed perjury at the post-conviction hearing. The court analogized the inference of perjury to the use of *res ipsa loquitur* in a negligence case, stating that the analogy here is "that the event (body of testimony in the post-conviction hearing and original reason for appeal) being the equivalent of the accident and the truthfulness or lack there of being equivalent to the negligence." *Id.* at 3. The court continued:

> *Obviously there is no precedent for making [the res ipsa loquitur] analogy but when faced with an impossibility you have to start somewhere.* As indicated on page 51 of this Court's original opinion, the entire theme of the record for appeal is that Petitioner avidly and vociferously maintained his innocence. He brutally asserted *through his counsel* over and over again that Murphy and the other students were hysterical and had fabricated these allegations. The record makes it clear that Petitioner could not face his wife and admit to these allegations. He was at that time, still subject to numerous civil suits.

*Id.* (first emphasis added).

In conclusion, the court drew "the inference that silence was [sic] on the issue of a guilty plea was not attributable to a lack of discussion about it between Merzbacher and Gutierrez[.]" *Id.* The court stated that the inference was based on four facts: (1) the parties were no longer before Judge Gordy; (2) the offer was never firmed up in terms of details; (3) "[Gutierrez] immediately told Merzbacher that [the ten-year option] was available, he rejected it, and they proceeded as they did because it was not acceptable[,]" *id.* at 4, and (4) it "seem[ed] contrary to human psychology to believe that she so compartmentalized the discussion about the ten years . . . that she would . . . persistently forget to mention it at some point[.] *Id.* at 3-4.

The post-conviction court then returned to whether it impermissibly relied on information outside the record when it rejected Gutierrez's testimony as not credible.  The court stated:

> The first problem with [the argument that the court impermissibly used facts outside the record] is if the case is remanded for a new finding of fact as to Ms. Gutierrez's credibility; the state will obviously offer extrinsic evidence impeaching her, such as that relied on by the court for the court to assess her credibility.  It is difficult to imagine that an appellate court would engage in a form of gamesmanship that says the state did not introduce this evidence, the court improperly relied on certain facts, that the court must be insulated from these facts and never consider them again, even if the analysis as to her credibility is strained as the result of the suppression of those facts.
>
> Those facts might not technically be subject to judicial notice under Maryland Rule 5-201(b) as facts not subject to reasonable dispute that are generally known within the territorial jurisdiction or as described by Lynn McLain, Maryland Evidence State and Federal § 201:4b, (2d. Ed. West 2001), as the "Everyone Around Here Knows That" Category.  The data are indeed adjudicable facts.  The facts that appear in the record of this post conviction are the record itself (the reason for Judge Quarles recusal); the Daily Record, and the Baltimore Sun (the Client Security Trust fund issue); and a Court of Appeals opinion (the bar admission controversy). Judicial notice is appropriate when the facts are self evidence and notorious, *A&H Transp. Inc. V. Mayor and City Council of Baltimore et al.*, 249 Md. 518, 530, 240 A.2d 601, 607 (1968), but by the same token the facts underlying the circumstances, especially relating to extenuating circumstances, may be said that they are notorious.  *Lerner v. Lerner Corp.*, 132 Md. App. 32, 40-41, 750 A.2d 709, 714 (2000) (declining to take judicial notice of corporation's offer to sell stock because its accuracy is subject to reasonable dispute and cannot be as readily and accurately entertained).  There appears to be a distinction between judicial notice and judicial knowledge, *see Wilhelm v. State*, 272 Md. 404, 439, 326 A.2d 707, 728 (1974) (In a broad sense the term 'judicial notice is used to denote both judicial knowledge (which courts possess) and common knowledge (which every informed individual possess)....); *Smart v. Graham*, 179 Md. 476, 484, 20 A.2d 574, 578 (1941)(concerning publicity surrounding the sale of the Hotel Rennert); *Franklin v. State*, 12 Md. 236, 245 (1858)(thrust of debates which took place at constitutional conventions).
>
> Federal case law establishes that a federal court will take judicial notice of among other things court records, especially those in the same court pertaining

to the same parties. McLain, *supra* 201:6, *St. Louis Baptist Temple v. Fed. Deposit Ins.*, 605 F.2d 1169, 1172 (10th Cir. 1979)("federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and limited to the federal judicial system, if theses [sic] proceedings have a direct relation to matters at issue").

. . . .

The Court of Appeals addressed this concept of relying on facts not formally in evidence in *Evans v. State*, 333 Md. 660, 637 A.2d 117 (1994), where in arguing for the death penalty the state mentioned that another inmate had escaped from the maximum security institute. The Court acknowledged that "[I]t is true that a prosecutor ordinarily may not comment on matters not in evidence, but it is proper for counsel to argue to the jury even though evidence of such facts has not been formally introduced–matters of common knowledge or matter of which the court can take judicial notice." *citing Wilhelm v. State*, 282 Md. 404, 438, 326 A.2d 707, 728 (1974). *Id.* at 679. The Court cites seven newspaper article [sic] about the escape and recapture, *Evans*, 333 Md. At 680-81, concluding that considering the wealth of publicity given the escape and recapture and its temporal proximity to Evans re-sentencing hearing, the prosecutor's reference to Harry Dean's escape from "Super Max" as in *Wilhelm*, "was but a direction by him to the jury of the fact that was within their common knowledge. *Wilhelm*, 272 Md. At 440.

The facts eroding Gutierrez's credibility were comparably notorious and contemporaneous.

. . . .

Making this credibility assessment on this basis is no more than resorting to the common knowledge of the vicinage and to require otherwise would strain the fact-finding process.

*Id.* at 5-8.

Ultimately, the post-conviction court rejected Merzbacher's claim for habeas relief for a second time. After the issuance of the second opinion, on August 29, 2006, this court dismissed without prejudice Merzbacher's February 24, 2006, § 2254 action, explaining that petitioners seeking habeas relief in federal court must completely exhaust each claim presented to the federal court through remedies available in state court. *Rose v. Lundy*, 455 U.S. 509, 518 (1982). Since Merzbacher still retained his right to seek leave to appeal the

circuit court's order to the Maryland Court of Special Appeals, he had not yet exhausted all of his available state court remedies, and could not yet pursue his claim in federal court.

On July 26, 2006, Merzbacher filed a timely application for leave to appeal in the Court of Special Appeals of Maryland, seeking review of the circuit court's June 26, 2006, order. On January 2, 2007, the Court of Special Appeals of Maryland summarily denied his application for leave to appeal. Merzbacher thereby exhausted all of the state remedies that were available to him. *See* Md. Cts & Jud. Proc. Code 12-202. On January 8, 2007, Merzbacher filed the instant action.

## II.  THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

Because this action was filed after April 24, 1996, it must be assessed under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA states, in pertinent part.

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> *(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.*

28 U.S.C. § 2254(d). (emphasis added). Furthermore, subsection (e)(1) provides:

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing

evidence.

28 U.S.C. § (e)(1).

Plainly, the AEDPA circumscribes this court's role. In *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997), the Supreme Court characterized § 2254(d) as a "new, highly deferential standard for evaluating state court rulings." Federal courts' collateral review of state court decisions must be consistent with the respect due state courts in our federal system. A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2); *see generally Miller-El v. Cockrell*, 537 U.S. 322, 340-41 (2003). In reviewing Merzbacher's attack on his state court convictions, this court presumes that factual determinations made by the state court are correct, and Merzbacher bears the burden of rebutting this presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). A federal habeas court may only overturn a state court's credibility judgments when the state court's error is "stark and clear." *Cagle v. Branker*, 520 F.3d 320, 324-25 (4th Cir. 2008) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).

The state court makes such an error under § 2254(d)(2) when its determination of facts is "objectively unreasonable." The Fifth Circuit recently provided a useful summary of the present state of AEDPA jurisprudence of relevance to this case:

> [AEDPA] governs a federal habeas court's review of a state prisoner's claims that were adjudicated on the merits in state court. 28 U.S.C. § 2254(d) .
> . . . Two provisions of the AEDPA deal with factual determinations of state

courts. Relief is warranted under § 2254(d)(2) if the state court's "adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The second provision, § 2254(e)(1), provides that a state court's factual findings are presumed to be correct, unless the petitioner rebuts them with clear and convincing evidence.

*Fields v. Thaler*, 588 F.3d 270, 273 (5th Cir. 2009).

The court further explained:

Although a lack of fair support in the record was sufficient to rebut a presumptively correct factual finding under pre-AEDPA law, the AEDPA increased the level of deference due to a state court's factual findings . . . . The Third Circuit has held that "[s]ilence in the record is insufficient to overcome" the § 2254(e)(1) presumption of correctness . . . . [T]here is currently a split among the circuits regarding the applicability of § 2254(d)(2) and § 2254(e)(1). In *Miller-El I*, the Supreme Court held that it was incorrect for this court "to merge the independent requirements of §§ 2254(d)(2) and (e)(1)." 537 U.S. at 341, 123 S.Ct. 1029. The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.

\*     \*     \*

In *Rice v. Collins*, 546 U.S. 333, 339, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006), the Court noted that the parties disagreed about whether and when the § 2254(e)(1) presumption was applicable during a § 2254(d)(2) review, but declined to resolve the disagreement.

In a case decided prior to *Miller-El I*, this court described the two provisions in a manner very similar to the Supreme Court's description in *Miller-El I*:

Whereas § 2254(d)(2) sets out a general standard by which the district court evaluates a state court's specific findings of fact, § 2254(e)(1) states what an applicant will have to show for the district court to reject a state court's determination of factual issues. For example, a district court may find by clear and convincing evidence that the state court erred with respect to a particular finding of fact, thus rebutting the presumption of correctness with respect to that fact. *See* § 2254(e)(1). It is then a separate question whether the state court's determination of

facts was unreasonable in light of the evidence presented in the state court proceeding. *See* § 2254(d)(2). Thus, it is possible that, while the state court erred with respect to one factual finding under § 2254(e)(1), its determination of facts resulting in its decision in the case was reasonable under § 2254(d)(2).

*Valdez v. Cockrell*, 274 F.3d 941, 951 n. 17 (5th Cir. 2001).

The Third, Fourth, Seventh, and Eighth Circuits appear to have a similar understanding of these AEDPA provisions that govern review of state court factual determinations . . . . *See Lambert v. Blackwell*, 387 F.3d 210, 235 (3d Cir. 2004) ( "the language of § 2254(d)(2) and § 2254(e)(1) implies an important distinction: § 2254(d)(2)'s reasonableness determination turns on a consideration of the totality of the 'evidence presented in the state-court proceeding,' while § 2254(e)(1) contemplates a challenge to the state court's individual factual determinations, including a challenge based wholly or in part on evidence outside the state trial record." (citing *Valdez and Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004))); *Lenz v. Washington*, 444 F.3d 295, 300 (4th Cir. 2006) (in determining whether state court's conclusion is an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, court presumes state court's factual findings to be correct unless rebutted by clear and convincing evidence); *Collier v. Norris*, 485 F.3d 415, 423 (8th Cir. 2007) (Notwithstanding assumption that petitioner has overcome presumption of correctness of two factual statements of state court by clear and convincing evidence, "it does not necessarily follow that the state court adjudication was based on an unreasonable determination of facts because subsection (d)(2) instructs federal courts to evaluate the reasonableness of the state court decision 'in light of the evidence presented in the State court proceeding' "); *Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008) (§ 2254(e)(1) provides mechanism for proving unreasonableness under § 2254(d)(2); if petitioner shows that state court determined an underlying factual issue against clear and convincing weight of evidence, petitioner has gone a long way towards proving that it committed unreasonable error).

The Ninth Circuit has held that § 2254(d)(2) applies when a petitioner challenges the state court's findings based entirely on the state record, and that § 2254(e)(1)'s presumption of correctness and clear-and-convincing standard of proof apply only when the habeas petitioner presents new evidence for the first time in federal court. *Taylor*, 366 F.3d at 999-1000; *see also Kesser v. Cambra*, 465 F.3d 351, 358 n. 1 (9th Cir. 2006) (en banc). The Eleventh Circuit observed that "the plain language of § 2254 does not provide the basis

for such a distinction." *Prevatte v. French*, 547 F.3d 1300, 1304 n. 1 (11th Cir. 2008). The First Circuit noted that the relationship between § 2254(d)(2) and § 2254(e)(1) has caused confusion and has not yet been definitely resolved. *See Teti v. Bender*, 507 F.3d 50, 57-58 (1st Cir. 2007).

This term, the Supreme Court is considering a case involving the applicability of § 2254(d)(2) and § 2254(e)(1). *Wood v. Allen*, 542 F.3d 1281 (11th Cir. 2008), *cert. granted*, --- U.S. ----, 129 S.Ct. 2389, 173 L.Ed.2d 1291 (2009). In that case, the petitioner, Wood, argued that in a case which is based only on evidence that was presented in state court, the habeas court should apply only § 2254(d)(2), and that § 2254(e)(1) applies only in cases involving evidence that was not presented in state court. The respondent argued that § 2254(e)(1) applies in every case, irrespective of whether the evidence was presented in state court.

*Id.* at 278-80 (some alterations added). (In the end, the Supreme Court found it inadvisable to address in *Wood* the interplay between § 2254(d)(2) and § 2254(e)(1). *See Wood v. Allen*, 130 S.Ct. 841, 851 (2010)).

More recently still, the Fourth Circuit has provided further guidance as to the interplay between § 2254(d)(2) and § 2254(e)(1):

Section 2254(d) provides AEDPA's framework for reviewing habeas petitions:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(d)(1) describes the standard of review to be applied to claims challenging how the state courts applied federal law, while § 2254(d)(2) describes the standard to be applied to claims challenging how the state courts determined the facts. Both provisions direct federal courts to assess the

reasonableness of the state court determinations, and both assessments must be made in light of the evidence the state courts had before them. The only limitation on § 2254(d)'s application is that the claims submitted must have been "adjudicated on the merits" in state court.

*     *     *

For a state court's factual determination to be unreasonable under § 2254(d)(2), it must be more than merely incorrect or erroneous . . . . It must be sufficiently against the weight of the evidence that it is objectively unreasonable.

An apparent tension between § 2254(d)(2) and § 2254(e)(1) arises because the latter section provides an alternate and seemingly inconsistent standard for review of state court factual determinations:

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

This section does not concern itself with the reasonableness of factual determinations by the state courts but with the correctness or incorrectness of those determinations. It further assigns a burden of proof to the petitioner-- clear and convincing evidence-- for negating them. Finally, unlike § 2254(d), there are no limitations on the application of § 2254(e). The precise interplay between these provisions has split the courts of appeals. *See Lambert v. Blackwell*, 387 F.3d 210, 234 (3d Cir. 2004) ("a comprehensive interpretation of AEDPA's factual review scheme has yet to emerge from the federal courts"); *Wood v. Allen*, 542 F.3d 1281, 1303-05 & n. 23 (11th Cir. 2008); *Teti v. Bender*, 507 F.3d 50, 57-58 (1st Cir. 2007); *Guidry v. Dretke*, 397 F.3d 306, 324-27 (5th Cir. 2005); *Taylor v. Maddox*, 366 F.3d 992, 999-1001 (9th Cir. 2004).

The Supreme Court has held that § 2254(d)(2) and § 2254(e)(1) provide "independent requirements" for review by the federal courts. *Miller-El v. Cockrell*, 537 U.S. 322, 341, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The sections should not, for instance, be merged to "require [the] petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence." *Id.* Both provisions apply independently to all habeas petitions. "To secure habeas relief, petitioner must demonstrate that a state court's [factual] finding . . . was incorrect by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and that [it] was 'objectively unreasonable' in light of the record

before the court." *Id.* at 348, 123 S.Ct. 1029 (emphasis added); *accord Miller-El v. Dretke*, 545 U.S. 231, 266, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). The Supreme Court has nevertheless left open the precise question of when and how § 2254(e)(1)'s presumption of correctness applies. *See Rice v. Collins*, 546 U.S. 333, 339, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006).

      Given these principles, we conclude that § 2254(d)(2) and § 2254(e)(1) will both ordinarily apply even after a district court has properly held an evidentiary hearing. First, we can discern nothing inconsistent with the concurrent application of § 2254(d)(2) and § 2254(e)(1) . . . . If a petitioner succeeds under § 2254(e)(1), he has merely proven that the state court finding was incorrect. To satisfy § 2254(d)(2), the petitioner must prove that the state court was not only incorrect, but also objectively unreasonable. Second, § 2254(e)(1) should apply because there is no limitation in the section's text. While there might a situation when it would be improper to apply a presumption of correctness to state court factual findings, for example, when the state proceedings violated due process, this would be the exception rather than the rule. *See Taylor*, 366 F.3d at 1000; see also 1 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 20.2c.

*Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010) (alterations added; citations and footnote omitted).

      In the more than 14 years since the AEDPA took effect, so far as this court has been able to discover, the Fourth Circuit has never found an instance in which the rebuttable presumption of correctness surrounding a state court's factual findings was successfully rebutted under § 2254(e)(1), or in which a state court merits decision was found to be the result of an unreasonable determination of facts in light of the evidence presented in the state court proceeding, as required by § 2254(d)(2). The Court has emphasized the deferential standard of review, especially of credibility findings. *See, e.g., Cagle*, 520 F.3d at 324; *Wilson v. Ozmint*, 352 F.3d 847, 858 (4th Cir. 2003) ("Credibility determinations . . . are factual determinations. As such, they 'are presumed to be correct absent clear and convincing evidence to the contrary, and a decision adjudicated on the merits and based on a factual

determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.'"), *modified in part*, 357 F.3d 461 (4th Cir. 2004), *cert. denied*, 542 U.S. 923 (2004). Nevertheless, "a federal court can disagree with a state court's credibility determination and, when guided by the AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Miller-El*, 537 U.S. at 340

In a small handful of cases, some courts of appeals have found that the presumption of correctness was rebutted and that a state court decision was based on a determination of facts that was unreasonable in light of the evidence presented, and granted habeas relief. *E.g.*, *Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009); *Anderson v. Terhune*, 516 F.3d 781 (9th Cir. 2008) (en banc); *Ben-Yisrayl v. Davis*, 431 F.3d 1043 (7th Cir. 2005); *Hall v. Director of Corrections*, 343 F.3d 976 (9th Cir. 2003); *Rolan v. Vaughn*, 445 F.3d 671 (3rd Cir. 2006); *and see Carrion v. Smith*, 644 F.Supp.2d 452 (S.D.N.Y. 2009) (granting § 2254 relief to state inmate on *Strickland* claim and concluding that state post-conviction court's finding that the defense attorney had fully counseled his client as to state's offer of a plea bargain for more favorable sentence was rebutted; state court's determination of facts to the contrary was unreasonable under AEDPA), *aff'd* 2010 WL 457326 (2d Cir. Feb. 11, 2010).

For the reasons explained *infra* at pages 35-57, the court's application of the above principles persuades the court that the state court record itself provides clear and convincing evidence rebutting the presumptive correctness of the dispositive facts relevant to the state court's adverse credibility determination, and furthermore, that the state post-conviction

court's overall factfinding as to Merzbacher's claim of ineffective assistance of counsel was not simply incorrect, but wholly unreasonable. Accordingly, the court concludes that Merzbacher has satisfied the procedural hurdles posed by AEDPA.

Deference to the decisions of state courts, even in the context of federal habeas, does not imply abandonment or abdication of judicial review. *See Miller-El*, 537 U.S. at 340. Under the constraints of AEDPA, it is a rare case where the adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). Courts grant relief under § 2254(d)(2) only when little or no evidence supports the state courts' conclusion and clear and convincing evidence directly contradicts it. *See Winston*, 592 F.3d at 554 ("For a state court's factual determination to be unreasonable under § 2254(d)(2), it must be more than merely incorrect or erroneous . . . . It must be sufficiently against the weight of the evidence that it is objectively unreasonable."). On the other hand, "[i]f a state court's finding rests on thin air, the petitioner will have little difficulty satisfying the standards for relief under § 2254." *Mendiola v. Schomig*, 224 F.3d 589, 592 (7th Cir. 2000). This is one of those very rare cases.

## III. ANALYSIS OF THE PROCEDURAL ISSUES UNDER AEDPA

### A. Identification of the Essential Facts Found by the State Post-Conviction Court

Having assessed the entirety of the state court record and having carefully scrutinized the post-conviction court's opinions, the court deems the following material "findings of fact" to be presumed correct:

1.  Merzbacher maintained his innocence, including to his wife;

2.  No final plea agreement ever was reached;

3.  Merzbacher was facing civil damages claims brought against him by his victims;

4.  The state's case was not a strong case and Merzbacher had a "good chance of successfully maintaining his defense;"

5.  Merzbacher's evidence offered "no cogent reason . . . as to why he would have dramatically changed his strategy and accepted ten years in prison;"

6.  The parties were no longer before Judge Gordy [at the commencement of the of the trial];

7.  The ten-year offer was never firmed up in terms of details;

8.  Gutierrez immediately told Merzbacher that [the ten-year option] was available, he rejected it, and they proceeded as they did because it was not acceptable;"

9.  It is "contrary to human psychology" that Gutierrez would forget to mention the ten-year offer; and

10. Gutierrez and Merzbacher each testified falsely during the post-conviction hearing.

Facts 1, 2, 3, and 7 are plainly true. Those facts are also irrelevant to the essential issues presented. The fact that Merzbacher continues to maintain his innocence (fact 1) surely has a bearing on *Strickland* prong two, but says nothing about whether he was apprised of the ten-year offer. Facts 2 and 7, stand in the same posture. No one has ever suggested that a plea agreement, as opposed to an offer to enter into a plea agreement, is the operative legal entitlement which imposed a duty on counsel. And fact 3 (the civil claims against Merzbacher) certainly was correctly determined. But again, that fact bears on the issue of

whether there was a likelihood (a "reasonable probability") that Merzbacher would have pled guilty. Accordingly, these facts, though not rebutted, are also immaterial to the legal issue presented.

Fact 4, the strength of the state's case, is shown to be incorrect (and reached in an objectively unreasonable manner) by the clear and convincing testimony of Judge Gordy at the post-conviction hearing. *See infra* pp. 67-68 (describing the credibility of some of the witnesses who would testify against Merzbacher, noting their "good" and "emphatic" memories of past events, and concluding that "the State would not only be able to put on a case but what was likely to be a strong case.").

Fact 5 suffers from the same infirmity as facts 1,2,3 and 7; it begs the question of whether, if Merzbacher had been adequately informed of his options, there is a reasonable probability that he would have pled guilty.

Fact 6 is demonstrably incorrect and arrived at unreasonably because at the time of the ten-year offer, the parties were not only before Judge Gordy, *it was he who prompted the state to make the offer in the first place*. It is wholly irrelevant to Merzbacher's claim that some other judge presided over his trial months later.

Fact 8, the post-conviction court's determination of "human psychology," is not only rebutted as incorrect (as a matter of common sense) but it is, manifestly (there is no other way to say it) absurd.

Finally, and most urgently, the court must assess whether the post-conviction court's credibility determinations are "sufficiently against the weight of the evidence that [they are] objectively unreasonable." *Winston*, 592 F.3d at 554. They are for the reasons that follow.

B.  The Post-Conviction Court's Flawed Factfinding

The post-conviction court made an unreasonable determination of the facts because no probative, admissible evidence supports its conclusion that Gutierrez perjured herself (and thus, Merzbacher did as well). Instead, the record contains overwhelming evidence that directly contradicts the post-conviction's court conclusion based on the testimony of the Assistant States' Attorney, the judge that presided over the plea negotiations, Merzbacher's two lawyers, and Merzbacher himself.  In sum, there is clear and convincing evidence that Merzbacher was never told about the plea agreement in a constitutionally sufficient manner, and almost certainly not told about it at all.

The post-conviction court, in reaching its unreasonable conclusion that Gutierrez told Merzbacher about the plea in a constitutionally sufficient way, relied heavily on facts that were impermissibly imported into the record.  It marshaled three key sources of information to determine that "[Gutierrez] is simply not worthy of belief."  2006 Op. at 53.  The post-conviction court referred to (1) Judge Quarles's recusal from the case; (2) the alleged circumstances surrounding Gutierrez's admission to the Maryland Bar more than 20 years before her testimony in this case; and (3) the fact that Gutierrez, suffering with physical ailments and her law practice in shambles, ultimately consented to disbarment. The post-conviction court's attempt to justify its use of information outside of the record was incorrect

and fundamentally unreasonable. Indeed, it stretched long-settled notions of due process to their limits, if it did not shatter those limits at all.

The post-conviction court also unreasonably determined that Kanwisher was "out of the loop" 2006 Supp. Op at 1, and therefore did not have a professional responsibility to tell Merzbacher about the plea agreement. There is no evidence that Kanwisher was "out of the loop." Instead, all evidence shows that he believed that Gutierrez had discussed the plea deal with Merzbacher and thus took no proactive role. This despite the fact that they "communicated pretty well" and "pretty much discussed every . . . major decision in the case." *See supra* p. 13 (Kanwisher testimony).

1. The Unimpeached Testimony of No Discussions of the Ten Year Offer

The record contains overwhelming evidence that Merzbacher was never told about the ten-year offer. His attorneys, Gutierrez and Kanwisher, both testified that they never told him. Their testimony cut significantly against their own interests since it suggests professional malfeasance. Additionally, Merzbacher himself testified that he was unaware that the plea agreement was a possibility for him.

*Gutierrez*

Gutierrez testified unequivocally that she did not communicate the plea offer to Merzbacher. In explaining why she failed to do so, she indicated that when the offer was made, she felt highly stressed due to having to move her law practice "literally overnight;" being involved in 200 hours of administrative hearings regarding the firing of Anne Arundel County teacher Laurie Cook; and having recently concluded the high-profile proceeding

involving Jacqueline McClean. Gutierrez further testified that she had "no recollection of telling Billy Kanwisher to do it. I'm sure I thought that I should have told him. And it was in my mind, but it's clear to me that I didn't do that. And I assumed that he did. And the next several months were very hectic for me just trying to keep my own practice going." (06-516, P. 4, Ex. 12, p. 23.)

There is simply no reason to believe that Gutierrez committed perjury with those statements. Sharon May, the Assistant State's Attorney, did attempt to impeach some of Gutierrez's testimony during the post-conviction hearing, but her attempts were unpersuasive. In trying to impeach Gutierrez, May highlighted a minor inconsistency in Gutierrez's testimony; and both May and the court intimate that Gutierrez persuaded Merzbacher to not accept the plea agreement based on her own selfish motives. But these suggestions fall flat; indeed, if the suggestion were true, it would bolster rather than undermine Merzbacher's claim that he never learned of the ten-year offer:

| | |
|---|---|
| COURT: | Was there a consensus between you and Ms. Gutierrez and Mr. Merzbacher on all the major decision, or where there times when she made a decision that you vehemently disagreed with? |
| A (Kanwisher): | Well, I think as to the plea, I wouldn't go so far as to say that it was a vehement disagreement, but it was a disagreement I think. |
| COURT: | Who took what position on the plea? |
| A: | Well, I wanted, in my view, I thought that Mr. Merzbacher should strongly consider the plea. There wasn't a great deal of discussion about it. As I recall, after the chambers conference, which was rather late in the evening, we left. I recall walking away and saying what do you think of it? And Ms. Gutierrez really didn't give me a -- there wasn't any kind of firm response to sort of bounce off of. I think I broached it with her one other time in her office about the plea. And again, there wasn't a - it |

|  | was kind of wish-washy, kinda response to it. So there wasn't a great deal of discussion between the two of us about the plea. |
|---|---|
| THE COURT: | So that I understand the climate, was it essentially that she thought that Ms. Murphy was so incredible that she could tear down her credibility and get a total acquittal and that a plea would not serve the interest of the client as well? Did that seem to be her attitude? |
| Ms. May: | You Honor, I object to what Ms. Gutierrez thought. |
| COURT: | No, I am asking if that's what she communicated, not what she thought. |
| COURT: | Did she essentially communicate to you, either directly or in so many words, that the reason that she didn't have as enthusiastic attitude about the plea as you was because she thought she could tear down the credibility of Ms. Murphy and get an outright acquittal? |
| A: | I think that she was very confident that she could do that. |

Transcript of October 31, 2000, hearing at 61:2-10; 65:23-66:5, 67:14-69:11.

In the initial set of hearings, May offered evidence of Gutierrez's experience. She demonstrated that Gutierrez tried hundreds of cases and often dealt with plea agreements. She highlighted that Gutierrez could not recall any other time she failed to communicate a plea agreement appropriately. (06-516, D. 4, Ex. 13, pg 51-53). The dubious inference being sought is that such an experienced lawyer would never forget about a plea offer. *Id.* at 41-42.

May also tried to show that Gutierrez testified inconsistently about the type of sentence one of her former clients received. Gutierrez testified that none of her clients ever received a life sentence at one point, and then later she was forced to amend that statement. She clarified that one of her clients did receive such a sentence, but that she categorized that sentence as a victory because he could have received the death penalty. (06-516, D. 4, Ex. 13,

pg 23). This minor discrepancy, later corrected, hardly suggests that Gutierrez is a perjurer. Notably, the post-conviction court did not rely on such evidence in concluding that Gutierrez perjured herself.

In her final attempt at impeachment, May attempted to offer evidence that Gutierrez might have advised Merzbacher to reject the plea because she believed that she could win, and that a win would bolster her professional reputation. May was unable to admit any actual evidence on this point. Instead, she relied on pointed questions to try and get her point across:

> [with] the publicity in this case and the fact that you had it, you as a private attorney who was considered by a number of people as an expert in the area of sexual child abuse cases, [didn't] this case gave you an opportunity to put yourself out there, to in effect, build your reputation and to build your client base?

(06-516, P. 4, Ex. 13 at 21). As mentioned, if, indeed, this line of impeachment had traction, it would bolster, rather than undermine, Merzbacher's claim because counsel would have been acting in pursuit of her own ends rather than providing zealous representation to her client. The post-conviction court wisely did not rely on it.

None of May's attempted impeachment provides support for the post-conviction court's conclusion that Gutierrez committed perjury on the stand. Further, there is little evidence to answer the question of what could possibly motivate a lawyer to sacrifice her legacy and good name and commit perjury for a defendant like Merzbacher, a convicted child rapist. It seems incredible to argue that Gutierrez would lie on the witness stand to bolster her own reputation in order to free a child rapist. Such an action was far more likely to have

exactly the opposite effect. Additionally, Merzbacher was not the most sympathetic of clients. Although one could at least conceive that a lawyer might sacrifice herself to save a wrongly convicted defendant from lethal injection, that is hardly the situation here.

Importantly, May never tried to impeach Gutierrez with the sources of information ultimately relied on by the post-conviction court. The ASA did not attempt to discuss Judge Quarles's recusal, the circumstances surrounding Gutierrez's bar admission, or Gutierrez's voluntary disbarment.

*Kanwisher*

Kanwisher provided additional, powerfully corroborating evidence that Merzbacher never learned of the plea agreement. He testified that he did not communicate the plea offer to Merzbacher and that he neglected to follow up with Gutierrez to ensure that Merzbacher learned about it. (06-516, P. 12, Ex. 4, pg. 60). Because Gutierrez was lead counsel and Merzbacher's retained counsel, Kanwisher believed that Gutierrez would be more persuasive and that telling Merzbacher about the plea deal was part of Gutierrez's responsibilities.

During his testimony, Kanwisher frequently reiterated his two points. He testified: "[t]o go to Merzbacher and persuasively recommend [to] him to take that particular plea, which, at the time, I thought should have been done, I was not in the best position to be the most persuasive member of that defense team to do so." (06-516, P. 4, Ex. 12, p. 61). He also said:

> My feeling was that that was Ms. Gutierrez's job because she was the chosen, retained, hired attorney in the case. . . . my feeling was . . . that he would only really listen to Gutierrez. On this kind of issue, I didn't carry the same weight

that she did.  And so, I didn't want it, in a sense, I didn't want to blow it by bringing [the plea bargain offer] in prematurely.  I thought, quite honestly, the best way to proceed on it would be that Ms. Gutierrez take him aside and explain it to him and recommend it to him.  Because she was just in a better posture to do it.

(*Id*. at 71-72).  Lastly he testified that: "In my view, I thought that the best way to resolve the case in a fair way with a fair plea, was to have Ms. Gutierrez go in and do the - for a lack of a better term - the sales job, and close the deal."[12]

Kanwisher's testimony is entirely credible, since it cuts directly against his self-interest.  He acknowledges that by not telling Merzbacher about the plea agreement, that he breached his professional responsibility under the Maryland Rules of Professional Conduct and acted incompetently. The post-conviction court does not remotely suggest anything to the contrary.

Q: An attorney is incompetent if the attorney does not communicate, or does not convey the [plea] offer, correct?
A: Well, nobody like to say they're incompetent.  But in that respect, I got to own up, I was incompetent.
Q: You were incompetent?
A: I should have at least, and this is at the very least, I should have pressed Ms. Gutierrez to not only convey it to him, but convey it to him a persuasive way.  And I didn't do that.  And I regret not going that and quiet honestly, if that means I'm incompetent, well th[e]n I am.

*Id*. at 73.

_____

[12] Merzbacher's testimony confirms Kanwisher's understanding of his role in the case. Merzbacher testified that Gutierrez was his lead counsel and that Kanwisher was a part of the defense team.  Further, Gutierrez's testimony also confirms Kanwisher's testimony: "But clearly, in the first trial, I was taking the first position.  I was going to do opening.  I was going to close. It would be centered around me . . . . And so the sense of the trial would be defined much more by my way of doing things, say then Bill's."  (06-516, P.4, Ex. 12 at 36).

In the original opinion denying post-conviction relief, the post-conviction court did not mention Kanwisher's failure to communicate the plea or his failure to follow up with Gutierrez regarding the plea. This was a serious omission; a failure to find a fact. *See Taylor, infra*.

*Merzbacher*

Merzbacher also testified that he was not told of the ten-year offer by either Gutierrez or Kanwisher:

> Q: At any time prior to you [sic] trial and sentencing, was that plea offer ever conveyed to you, yes or no?
> A: No sir
> . . . .
> Q: And, when was the first time, if you can recall, that you heard about the fact that there was a plea made under those parameters, the ones that we're talking about in the courtroom today?
> A: When you were working on my post-conviction.

*Id*. at 87-88. To be sure, while under cross-examination, Merzbacher made some allusions to a vaguely-recalled mention of guilty plea on the first day of trial. *Id*. at 88. Of course, the type of testimony offered by Merzbacher is subject to heavy skepticism. *See, e.g.*, *Hooper v. Garraghty*, 845 F.2d 471, 475 (4th Cir. 1988) *cert. denied*, 488 U.S. 843 (1988) (noting "obvious credibility problems" associated with petitioner's self-serving claim that he would not have pled guilty had counsel not been ineffective as alleged). Nevertheless, his testimony is corroborated by his lawyers' testimony. The cumulative effect of the testimony is far more persuasive than merely considering Merzbacher's individual statements. This is especially so in light of the

fact that the post-conviction court's finding that Merzbacher committed perjury is derivative of its finding that Gutierrez committed perjury.

*     *     *

As can be seen, the evidence properly before the post-conviction court because it was properly admitted through the adversarial process provide no substantial basis to reject the contention that Merzbacher never learned of the ten-year offer from his attorneys. The court now turns to evidence which lies at the heart of the post-conviction court's adverse credibility findings.

### 2.  The Post-Conviction Court's Procurement of Extra-Record Information

#### A. Legal Framework for the Analysis

Judge Kozinski has cogently illustrated a useful analytical framework for the assessment called for in this unique case. In *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004), he described the four "flavors" of tainted state court factfinding which may give rise to an "objectively unreasonable" determination by a federal habeas court exercising jurisdiction under 28 U.S.C. § 2254:

> We interpret [the AEDPA] sensibly, faithful to their text and consistent with the maxim that we must construe statutory language so as to avoid contradiction or redundancy. The first provision-the "unreasonable determination" clause-applies most readily to situations where petitioner challenges the state court's findings based entirely on the state record. Such a challenge may be based on the claim that the finding is unsupported by sufficient evidence, *see, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2538-39, 156 L.Ed.2d 471 (2003); *Ward v. Sternes*, 334 F.3d 696, 705-08 (7th Cir. 2003), that the process employed by the state court is defective, *see, e.g.*, *Nunes v. Mueller*, 350 F.3d 1045, 1055-56 (9th Cir. 2003); *Valdez v. Cockrell*, 274 F.3d 941, 961-68 (5th Cir. 2001) (Dennis, J., dissenting), or that no

finding was made by the state court at all, *see, e.g., Weaver v. Thompson*, 197 F.3d 359, 363 (9th Cir. 1999); *cf. Wiggins*, 123 S.Ct. at 2539-41. What the "unreasonable determination" clause teaches us is that, in conducting this kind of intrinsic review of a state court's processes, we must be particularly deferential to our state-court colleagues. For example, in concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record. *Cf. Lockyer*, 538 U.S. at 75, 123 S.Ct. 1166. Similarly, before we can determine that the state-court factfinding process is defective in some material way, or perhaps non-existent, we must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.

\*        \*        \*

Petitioner here did not present any evidence in federal court. Instead, the district court rejected petitioner's claim at the initial, or intrinsic, stage of the review process. The appeal before us is therefore governed by the "unreasonable determination" standard of section 2254(d)(2). What we must determine is whether petitioner's conviction "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." This is a daunting standard-one that will be satisfied in relatively few cases. Nevertheless, the standard is not impossible to meet; as the Supreme Court pointed out in *Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), "Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable." *Id.* at 340, 123 S.Ct. 1029. Indeed, the Supreme Court, our court and other circuits have all found the standard met. *See Wiggins*, 123 S.Ct. at 2538-39; *Norton v. Spencer*, 351 F.3d 1, 6-8 (1st Cir. 2003); *Ward*, 334 F.3d at 705; *Nunes*, 350 F.3d at 1056; *Hall v. Dir. of Corrections*, 343 F.3d 976, 983 (9th Cir. 2003); *Bui v. Haley*, 321 F.3d 1304, 1315 (11th Cir. 2003); *Miller v. Dormire*, 310 F.3d 600, 603-04 (8th Cir. 2002); *Bradley v. Duncan*, 315 F.3d 1091, 1096 (9th Cir. 2002); *Paxton v. Ward*, 199 F.3d 1197, 1210 (10th Cir. 1999).

As noted, intrinsic challenges to state-court findings pursuant to the "unreasonable determination" standard come in several flavors, each presenting its own peculiar set of considerations. No doubt the simplest is the situation where the state court should have made a finding of fact but neglected

to do so. In that situation, the state-court factual determination is perforce unreasonable and there is nothing to which the presumption of correctness can attach. *See, e.g., Wiggins*, 123 S.Ct. at 2539-40; *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002); *Weaver*, 197 F.3d at 363; *Nunes*, 350 F.3d at 1055. A somewhat different set of considerations applies where the state court does make factual findings, but does so under a misapprehension as to the correct legal standard. *See, e.g., Caliendo v. Warden*, 2004 WL 720362, at *6 (9th Cir. Apr. 5, 2004); *Fernandez v. Roe*, 286 F.3d 1073, 1077 (9th Cir. 2002); *Wade v. Terhune*, 202 F.3d 1190, 1197 (9th Cir. 2000). Obviously, where the state court's legal error infects the fact-finding process, the resulting factual determination will be unreasonable and no presumption of correctness can attach to it.

> Closely related to cases where the state courts make factual findings infected by substantive legal error are those where the fact-finding process itself is defective. If, for example, a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an "unreasonable determination" of the facts. *See, e.g., Weaver*, 197 F.3d at 363; *Nunes*, 350 F.3d at 1055; *cf. Bryan v. Mullin*, 335 F.3d 1207, 1215-16 (10th Cir. 2003) (declining to apply presumption where state court failed to hold an evidentiary hearing). *But see Valdez*, 274 F.3d at 948-50 (sections 2254(d)(2) and (e)(1) apply despite defects in the state-court hearing). Similarly, where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable. *See, e.g., Wiggins*, 123 S.Ct. at 2538-39; *Hall*, 343 F.3d at 983. And, as the Supreme Court noted in *Miller-El*, the state-court fact-finding process is undermined where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim. *Miller-El*, 537 U.S. at 346, 123 S.Ct. 1029.

*Id.* at 999-1001, *cited with approval, in part*, *Winston*, 592 F.3d at 554. As explained within, at least two of the four "flavors" identified in *Taylor*, "where the state court does make factual findings, but does so under a misapprehension as to the correct legal standard" and "where the fact-finding process itself is defective," *id.*, apply in this case.

### B. Application of the Legal Principles

Evidently nonplussed by the lack of legitimate, admissible, probative evidence that Merzbacher's attorneys actually told him of the ten-year offer and fully discussed it with him, the post-conviction court relied heavily-- and impermissibly--on information imported from outside of the record to support its conclusion that Gutierrez told Merzbacher about the plea in a constitutionally sufficient way. The post-conviction court pointed to three extra-record sources of information to support its penultimate finding that Gutierrez committed perjury and that therefore she did fully discuss the ten-year offer with Merzbacher: (1) the recusal of Judge Quarles from the post-conviction proceedings; (2) the circumstances of Gutierrez's admission to the Maryland Bar in the 1980s; and (3) newspaper reports of Gutierrez's voluntary disbarment by the Maryland Court of Appeals.

None of these sources of information was properly before the post-conviction court. The post-conviction court made a herculean effort to justify its resort to such sources of information with three ostensible justifications: (1) that the state could obtain the same information and present it if an appellate court determined it was error for the court itself to obtain the evidence; (2) judicial notice; and (3) "judicial knowledge." In fact, under the unique circumstances presented here, the post-conviction court's efforts to legitimize its extra-record marshalling of sources of information only do two things: (1) they demonstrate the paucity of any legitimate basis for the court's consideration of these sources of information; and (2) they establish clearly and convincingly that this is a case "where the state court [made] factual findings, but [did] so under a misapprehension as to the correct legal standard" and "where the fact-finding process itself [was] defective." *Id.* The court will

discuss in turn (and in tandem) the three justifications and the three sources of information improperly relied on by the post-conviction court.

### 1. The Impropriety of a "Freelancing" Judge

The post-conviction court asserted that the three extra-record sources of information should be considered because "if the case is remanded for a new finding of fact as to Gutierrez's credibility; the state will obviously offer extrinsic evidence impeaching her." 2006 Supp. Op. at 6. This derogation of the judicial role is as shocking as it is casual. It is simply unthinkable that an appellate court would countenance the act of a judge who steps outside the record of an adversarial proceedings to collect evidence supportive of one side to the dispute on the premise that, if such behavior is found improper, the favored adversary may introduce the evidence itself upon a remand. Fundamental fairness dictates that courts may not obtain and then secretly consider evidence outside the record just because the favored party *might* offer that evidence if the appellate court granted a re-trial. *See Legal Aid Bureau*, 540 A.2d 1175, 1180 (Md. App. 1988) ("A judge may not conduct 'any kind of independent investigation' into the facts that he or she must ultimately determine.") (citation omitted). Nevertheless, the post-conviction court stated:

> The first problem with [not relying on information outside the record] is if the case is remanded for a new finding of fact as to Ms. Gutierrez's credibility; the state will obviously offer extrinsic evidence impeaching her, such as that relied on by the court for the court to assess her credibility. It is difficult to imagine that an appellate court would engage in a form of gamesmanship that says the state did not introduce this evidence, the court improperly relied on certain facts, that the court must be insulated from these facts and never consider them again, even if the analysis as to her credibility is strained as the result of the suppression of those facts.

2006 Supp. Op at 6 (citations omitted).  Simply put, there is no rule, law, or case that stands for the proposition that a judge may consider anything he or she wants to as long as there is some possibility that a party might obtain and use that information in a future proceedings in the same case. This was a serious legal error infecting the post-conviction court's factfinding.

## 2. Judicial Notice

It is beyond dispute that the sources of information relied on by the post-conviction court to support its inference of Gutierrez's alleged perjury are not proper vehicles for the exercise of judicial notice.  *See* Fed.R.Evid. § 5-201(b) (providing that a court may take judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").   (The Maryland Rule is essentially identical to the federal rule.) An "adjudicative fact" is a fact "*concerning the immediate parties*--who did what, where, when, how, and with what motive or intent." Fed.R.Evid. 201 Advisory Committee's Note (quoting 2 Kenneth C. Davis, *Administrative Law Treatise* at 353 (1958) (emphasis added)).  Plainly, *Gutierrez was not a party to this post-conviction case*.

Furthermore, once a court takes judicial notice of a fact, "a party is entitled to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed.  In the absence of prior notification, the request may be made after judicial notice

has been taken." Fed.R.Evid. 201(e). Accordingly, a judge must grant the parties an opportunity to dispute any fact that is judicially noted. This did not happen here.

The post-conviction court concedes that the three sources of information on which it relied to determine Gutierrez's credibility "might not technically be subject to judicial notice under Maryland Rule 5-201(b) as facts not subject to reasonable dispute that are generally known within the territorial jurisdiction." 2006 Supp. Op. at 5. There simply is no "maybe" about it. The facts mined by the post-conviction court from the extra-record sources of information fall outside the proper scope of judicial notice.[13] Moreover, Merzbacher did not have a proper opportunity to dispute with countervailing evidence, the "facts," and their effects on the court's factfinding process, that the post-conviction court judicially noticed. The conclusion is inescapable that the post-conviction court "misapprehended . . . the correct legal standard" that informed its factfinding and that "the fact-finding process itself [was] defective." *Taylor*, 366 F.3d at 1001.

It was especially irregular for the post-conviction court to take "judicial notice" of Judge Quarles' recusal from this post-conviction proceedings (and his ostensible reasons for doing so). In the post-conviction court's heavy reliance on the scant information surrounding the recusal, information utterly untested by the adversarial process lying at the heart of very

---

[13] Indeed, in the very case cited by the post-conviction court, the Court of Special Appeals of Maryland signaled the inappropriateness of taking judicial in the circumstances here. *See Lerner v. Lerner Corp.*, 750 A.2d 709, 714 (Md. App. 2000) ("The doctrine of judicial notice substitutes for formal proof of a fact '*when formal proof is clearly unnecessary to enhance the accuracy of the fact-finding process*.'" (emphasis added; citation omitted)).

concept of due process, the post-conviction court absolutely turned the notion of recusal on its head. It will be recalled that Judge Quarles recused himself upon motion by the state. *See supra* n. 5. It is remarkable that *Merzbacher's adversary*, the state, no doubt desiring to ensure that the post-conviction proceedings would be attended with the integrity judicial proceedings demand, both in reality as well as in appearance, took steps to achieve that integrity only to have it undermined when the post-conviction court used the very information, scant though it was, that the state sought to have excluded from the proceedings. In any event, the state's motion to one side, *Judge Quarles's reasons or motivations for granting the state's recusal motion never became a part of the record in this case*.

Here, the post-conviction court actually used Judge Quarles's (alleged) statement in the Adnan Syed case to bolster its evidentiary foundation to establish Gutierrez's reputation as a liar, and thus to draw an inference that she committed perjury. In other words, the post-conviction court implicitly found that Judge Quarles made the statement in the Adnan Syed case because he *actually found or believed that Gutierrez was a liar*. Of course, the record contains not a *scintilla* of admissible evidence of what Judge Quarles believed. Nor can one fathom how such evidence could ever gain admissibility in a post-conviction proceeding such as the case here.

The post-conviction court also purported to take "judicial notice" of a Maryland Court of Appeals case, *In re Application of Maria C. For Admission to the Bar of Maryland*, 451 A.2d 655 (Md. 1982). In that case, the court admitted "Maria C" to the Bar of Maryland. The sole dissenting judge, Judge Smith, argued that "Maria C." should not be admitted to the

bar because she concealed shoplifting convictions she incurred prior to 1975. *Id.* at 538-39 (Smith, J., dissenting). Indicating that it knew that "Maria C." was actually Gutierrez, the post-conviction court relied on the information contained in Judge Smith's dissenting opinion to support its finding that Gutierrez's reputation was that she was a liar and thereby to draw the inference that Gutierrez committed perjury at the post-conviction hearing.

What has already been said makes plain the impropriety of the post-conviction court's actions in respect to this "bar admission" evidence. *No party* in a case before a trial court in Maryland, governmental or civilian, criminal proceeding or civil proceeding, would ever be permitted to rely on a theft conviction more than 25 years old to impeach a witness. Md. Rule 5-608 provides as follows, in part (emphases added):

> (a) Generally. For the purpose of attacking the credibility of a witness, *evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness*, but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or objecting party.
> (b) *Time limit. Evidence of a conviction is not admissible under this Rule if a period of more than 15 years has elapsed since the date of the conviction.*

It is plain that the post-conviction court applied some unknown corrupted form of this rule, applying some version it would never have applied in a criminal or civil jury trial.

In any event, as with the recusal and the disbarment evidence (discussed *infra*), no proper evidence was entered into record in this case; it was wholly improper for the court to have considered such information. Again, the conclusion is inescapable that the post-conviction court "misapprehended . . . the correct legal standard" applicable to its task of

factfinding and that "the fact-finding process itself [was] defective." *Taylor*, 366 F.3d at 1001.

Finally, as a matter of law, Gutierrez's decision to accept disbarment in 2001 was not probative of her credibility. The post-conviction court deemed it appropriate to consider because two local newspapers, the *Daily Record* and *Baltimore Sun* published articles reporting the situation,[14] but these articles were not entered into the record. Further, they contained facts subject to dispute and not capable of ready determination by resort to sources that are unquestionably accurate.

Courts may take judicial notice of certain facts in newspapers. For example, courts have taken judicial notice of gasoline's flammability, the price of a stock, and the time that the sun sets. *Hoffman v. Mayor and City Council of Baltimore*, 51 A.2d 269 (Md. 1958) (taking judicial notice of the fact that gasoline is highly inflammable and dangerous); *Gravenstine v. Gravenstine*, 472 A.2d 1001 (Md. App. 1984) (taking judicial notice of a stock market report based on its publication in a newspaper); *Wiggins v. State*, 241 A.2d 424 (Md. App. 1968), *cert. denied,* 251 Md. 753 (taking judicial notice of the time the moon or

---

[14] The *Baltimore Sun* article cited by the post-conviction court states that Gutierrez voluntarily agreed to her disbarment and did not fight complaints filed against her by the state Attorney Grievance Commission. Sarah Koenig, *Attorney is Drawing Numerous Complaints,* Baltimore Sun, July 19, 2001 at 1B. The article explains that Gutierrez spent about three months in the hospital at the end of 2000 and early 2001, suffered from multiple sclerosis and went blind in one eye and was not physically able to continue practicing law. *Id.* According to the article, she was disbarred on May 24, 2001.

sun set on a particular day).  These facts are all without dispute and capable of ready determination.

Here, the post-conviction court used a newspaper article to help bolster its inference that Gutierrez committed perjury.  The article itself offers multiple explanations for Gutierrez's disbarment.  A fact-finder might determine, for example, based on the article, that Gutierrez voluntarily accepted disbarment due to her rapidly deteriorating physical condition, for example.  Or that fact-finder might think that Gutierrez cheated her clients and possibly acted in a less than ethical manner.  The assertions in the article are merely that–unproven assertions.  They are not hard facts and accordingly they are not subject judicial notice.

The state, as Merzbacher's adversary in the post-conviction proceeding, did not attempt any of the disputed impeachment avenues the court resorted to on its own. The conclusion is inescapable that the state fully recognized the impropriety of such impeachment and that objections would have been sustained. By resorting to such sources on its own, the post-conviction court deprived Merzbacher of a fair opportunity, as required by due process, to dispute the "facts" supported by the "evidence" the post-conviction court "admitted." "While there might a situation when it would be improper to apply a presumption of correctness to state court factual findings, for example, when the state proceedings violated due process, this would be the exception rather than the rule."  *Winston*, 592 F.3d at 554 (citing *Taylor*, 366 F.3d at 1000).  The post-conviction court's reliance on judicial notice plainly deprived Merzbacher of the right to confront an adverse witness.  *Id.*; *see also Macht v. Hecht Co.*, 59 A.2d 754, 756 (Md. 1948) (finding that an adversary must be permitted to

dispute evidence, even evidence admitted via judicial notice). If Merzbacher knew that the court intended to rely on certain information outside the record to undermine Gutierrez's credibility, he could have brought witnesses to discredit those witnesses or rehabilitate Gutierrez's credibility. Merzbacher was not provided that option.

### 3. Judicial Knowledge

The post-conviction court also discusses "judicial knowledge" as a justification for considering evidence not admitted into the record. The court seems to converge this novel concept of judicial knowledge into judicial notice: "There appears to be a distinction between judicial notice and judicial knowledge, *see Wilhelm v. State*, 326 A.2d 707, 727 (1974) (In a broad sense the term 'judicial notice' is used to denote both judicial knowledge (which courts possess) and common knowledge (which every informed individual possess). . . . )." 2006 Supp. Op. at 5-6. Later, the court again argues that information "not formally in evidence," but that is common knowledge should be permitted, and analogizes to *Evans v. State*, 637 A.2d 117 (Md. 1994). 2006 Supp. Op. at 7. What has been stated already about judicial notice applies with equal force to whatever is meant by "judicial knowledge."

## IV. THE SIXTH AMENDMENT RIGHT TO EFFECTIVE REPRESENTATION

### A. The Legal Standard

To establish a claim of ineffective assistance of trial counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 694

(1984); *Briley v. Bass*, 750 F.2d 1238, 1247 (4th Cir. 1984). With regard to the first prong of this test, a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. All circumstances are to be considered, and a court's scrutiny of counsel's conduct must be "highly deferential." *Id.* at 688-89. Even if counsel committed a professionally unreasonable error, relief can be granted only if "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *See Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

A lawyer fails to provide effective assistance when she fails to inform her client of a plea offer. U.S. CONST. AMEND. VI; *Cullen v. U.S.*, 194 F.3d 401 (2nd Cir. 1999) (holding that defense counsel's performance was deficient because he failed to inform defendants of terms of offered plea bargain and failed to offer any advice as to whether plea bargain should be accepted); *Johnson v. Duckworth,* 793 F. 2d 898, 900-02 (7th Cir. 1986) (defense counsel should keep defendant apprised of all development in the plea negotiation process and communicate the prosecutor's proposals promptly); *United States v. Blaylock*, 20 F.3d 1458, 1465-66 (9th Cir. 1994) (failing to inform defendant of plea offer was unreasonable assistance); *United States v. Leonti*, 326 F.3d 1111 (9th Cir. 2003); *United States ex rel. Caruso v. Zelinsky*, 689 F.2d 435 (3d Cir. 1982) (failure to communicate a plea bargain offer to defendant denied defendant his Sixth and Fourteen Amendment rights to effective assistance of counsel). *See supra* n. 1. Additionally, a fair trial subsequent to ineffective assistance at the plea bargaining stage does not cure the underlying constitutional deficiency

that occurs when a lawyer fails to inform his client about a plea agreement opportunity. *See United States v. Day,* 969 F.2d 39 (3d Cir. 1992).

Both the Maryland Rules of Professional Conduct and the American Bar Association standards support the premise that a lawyer provides ineffective assistance of counsel when he or she neglects to inform a defendant about a possible plea agreement. *See* Maryland Rules of Professional Conduct, Rule 1.4 (requiring defense counsel to communicate the terms of all plea offers made); *Strickland*, 466 U.S. at 688 (calling the American Bar Association's standards guides to determining what is reasonable).

To prevail in the second prong of *Strickland*, a petitioner must demonstrate prejudice: a "reasonable probability" that the criminal proceeding would turn out differently if the attorney performs competently. Such proof must be a probability sufficient to undermine confidence in the outcome of the proceedings. *Strickland* 466 U.S. at 684. In the context of plea negotiations, a petitioner must demonstrate more than "self serving statements" that he would have accepted the plea. *See Toro v. Fairman*, 940 F.2d 1065, 1068 (7th Cir. 1991). Generally speaking, "courts should be wary of this sort of claim because defendants will always want the best of both worlds; the chance of acquittal at trial, yet the chance to plead guilty if the trial defense fails." *Day*, 969 F.2d at 43 n. 9.

B. Application of the Legal Standard

Here, there is absolutely no evidence apart from the post-conviction court's sheer speculation to support the assertion that Gutierrez told Merzbacher about the plea at all, let alone that Merzbacher knew about the details with sufficient specificity to make an informed

decision. The post-conviction court acknowledged that finding that Merzbacher knew about the plea is directly contradicted by all of the direct evidence. 2006 Supp. Op. at 3. Yet somehow the court reasoned that the offer was "discussed and rejected" "from the totality of the circumstances in the record." *Id.* The court analogized the inference to *res ipsa loquitur*, stating that the analogy here is "that the event (body of testimony in the post-conviction hearing and original reason for appeal) being the equivalent of the accident and the truthfulness or lack there of being equivalent to the negligence." *Id.* The court found this despite conceding that the only direct evidence directly contradicted this conclusion and that this type of decision had no precedent. *Id.* In other words, the court inexplicably relied on evidence that directly refuted its conclusion to support its conclusion.

Importantly, the post-conviction court clearly expressed how essential the extra-judicial facts were in assisting it to make its final decision. The court specifically stated that without the three assertions discussed above, "the analysis as to [Gutierrez's] credibility is strained." 2006 Supp. Op. at 5. So the court relied in part on facts that provided no support and partially on facts that, as a matter of law, it could not consider. This process of adjudication cannot substitute for legal reasoning in a court of law. It goes beyond the realm of "unreasonable" as defined in AEDPA and reaches into the absurd.

The post-conviction court made a finding in its second opinion that Kanwisher was "out of the loop."[15] This finding is unreasonable. Rather, all parties agree that Kanwisher

---

[15] In the original opinion denying relief the post-conviction court made no mention of Kanwisher's failure to communicate the plea or failure to follow up with Gutierrez regarding the

second-chaired the case and was consulted on all major decision. Kanwisher testified that he

believed Gutierrez should have been the one to convey the plea offer to Merzbacher, but, that

upon reflection, that it was his professional duty to also discuss the offer with Merzbacher.

His testimony was credited in substantial part by the post-conviction court, and it is both

reasonable and logical:

> Q:    You did not take the plea, according to you, to the defendant?
> A:    No.
> Q:    You felt you had an obligation to do so, but you didn't?
> A:    No, and I regret it.
> Q:    Now, are you familiar with the Rules of Professional Conduct, specifically Rule 1.4 of oral communication?
> A;    I am.
> Q:    And that says that you have to convey an offer whether it's civil, criminal, whatever it is, you have to communicate with the client and tell them what's going on?
> A:    That's right.
> Q:    Now, in this particular case, was there any thought that this defendant would not have taken the plea, whether it was this one or any other?
> A:    Well, like I said before, Mr. Merzbacher maintained his innocence throughout.
> Q:    As afar as you know, he maintains it today?
> A:    I don't know. I mean, I haven't seen him. This is first time I've seen him since the sentencing. So I don't know. You know, I mean he maintained that. But that's no excuse. And quite honestly that didn't go into my decision not to take it to him. My feeling was that that was Ms. Gutierrez's job because she was the chosen, retained, hired attorney in the case. And that's not to say, and its' no excuse, I'm not trying to make an excuse. I mean, ultimately when I look back on it, and I probably should have done it anyway, but my feeling was that because he was maintaining his innocence, that he would only really listen to Gutierrez. On this kind of issue, I didn't carry the same weight that she did. And so, I didn't want it, in a sense, I didn't want to blow it by bringing it in prematurely. I thought, quite honestly, the best way to

plea. (06-516, Ex. 4.)

proceed on it would be that Ms. Gutierrez take him aside and explain it to him and recommend it to him. Because she was just in a better posture to do it. So, in hind sight, I wish I had done it. I know I should have done it. I certainly knew at the time I had an obligation to do it, but in my view, I thought that the best way to resolve the cases in a fair with a fair plea, was to have Ms. Gutierrez go in and do the–for a lack of a better term–the sales job, and close the deal. So, it wasn't–to answer the question, it didn't go...Mr. Merzbacher's maintaining his innocence did not go into my calculation when I said, I'm going to step back from the situation and let Gutierrez do it. My thinking on it was that she's the tool for the job. She was–we didn't need a saw, we needed a hammer. And she was going to the hammer and go in and deal with it. And that was my feeling on it.

Q:     So you felt she should have done it?

A:     Right.

Q:     But you knew that as an attorney under the Maryland Rules of Professional Conduct, you needed to communicate the plea?

A:     Yeah, I did.

Q:     And you didn't push her to see that it was done?

A:     I didn't. I regret that too.

Q:     Are you familiar with the *Williams* case which has been cited, I believe, in the petition?

A:     Yes, I'm familiar with *Williams*....

Q:     And, I guess, bottom line, an attorney is incompetent if the attorney does not communicate, or does not convey the offer, correct?

A:     Well, nobody likes to say they're incompetent. But in that respect, I got to own up, I was incompetent.

Q:     You were incompetent?

A:     I should have at least, and this is at the very least, I should have pressed Ms. Gutierrez to not only convey it to him, but to convey it to him in a persuasive way. And I didn't do that. And I regret not doing that and quite honestly, if that means I'm incompetent, well than I am.

*Id.*, p. 73.

The fact that Kanwisher admits his own incompetence in the situation further evidences that he played an active role in the litigation. In sum, the post-conviction court

was unreasonable when it found that Kanwisher was "out of the loop" and did not have an obligation to Merzbacher.

To satisfy the second prong of *Strickland*, Merzbacher must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Briley v. Bass*, 750 F.2d 1238, 1247 (4th Cir. 1984). For those conditions to be satisfied, Merzbacher must show a reasonable probability that, with proper advice, he would have accepted the plea offer, and the terms of the offer must have been sufficiently specific so that he could have accepted it. Both contingencies are satisfied here.[16]

Merzbacher's testimony unambiguously asserts that he would have immediately accepted the State's plea offer.

> Q: Had you been aware that the plea was offered to you by the State, would you have accepted that plea?
> A: Most graciously.
> Q: And why is that Mr. Merzbacher? Why would you have accepted the plea?
> A: Well, because I didn't have any money to continue to fight and from what I understand, I believe the way Ms. May and Ms. Gutierrez had it set up, there were going to be, I believe we're talking about eleven or fifteen different trials. Which means I would have to pay for each one of those. We didn't have the

---

[16] The post-conviction court found that Merzbacher would *not* have accepted a guilty plea, and there is some evidence to support that conclusion. It is undisputed that Merzbacher maintained his innocence throughout the proceeding. Also, evidence supported that idea that petitioner would have had personal difficulty pleading guilty because he did not want to lose the support of his family and friends. The post-conviction court found that Merzbacher "stood a good chance of successfully maintaining his defense" in the Murphy case, and Gutierrez testified that she believed that she could win this individual case (she did not express confidence about the fifteen other cases; indeed, she was not even counsel in the other cases). But the facts militating towards accepting the plea bargain are far more compelling.

money.  I was scared.  The publicity. . . . And it just seemed like it was blowing out of proportion.  People were coming out of the woodwork.  The Archdiocese had turned their back of me. . . And yes, I would have taken the plea.

Q: The pre-trial publicity that you mentioned earlier and referred to again.  Did this also play a role in your decision as to whether or not you would have taken the plea had it been offered?

A: Yes, because the pre-trial publicity - the publicity was so bad that I was ruined for the rest of my life.  I was ruined anyways. . . . I mean I was created as a monster.

(06-516, P. 4, ex. 12 at 89).

On cross-examination, Merzbacher is reminded that he repeatedly asserted his innocence throughout this trial.  But this assertion of innocence does not preclude accepting a future plea offer, as defendants often accept plea agreements despite previously, often vigorously, proclaiming innocence.  Stephanos Bibas, *Harmonizing Substantive Criminal-Law Values and Criminal Procedure: The Case of Alford and Nolo Contendere Pleas*, 88 Cornell L. Rev. 1361, 1296-97 & n. 71 (2003) (citing statistics to show that the vast majority of criminal defendants in federal court plead guilty (94% in 2000) and arguing that many defendants pled guilty when they are in fact innocent to obtain a more favorable sentence); *see also* Albert Alschuler, *The Defense Attorney's Role in Plea Bargaining*, 84 Yale L.J. 1179, 1292, 1296-97 (1975) ("Whether the defendant denies his guilt, whether his attorney considers him innocent, and whether the trial court might feel more comfortable after a trial should not be determinative. Indeed, because the extreme pressures of the guilty-plea system can make it unwise to run even a slight risk of conviction, not even the probability of acquittal should stand in the way of a plea of guilty.")

Merzbacher's legal situation and the generosity of the ten-year offer support the assertion that Merzbacher would have accepted the plea bargain. His legal predicament was disastrous. He had sixteen independent cases pending against him and insufficient funds to pay Gutierrez to represent him in all of them. His case was subject to incessant and constant media attention. His chances of winning all sixteen cases was unclear at best – even if he believed that Gutierrez could win the Murphy case, there is no evidence concerning her assessment of the other 15 cases. According to Judge Gordy, the victims in some of those sixteen cases offered specific, emphatic and shocking testimony that weighted in favor of the state winning convictions. Judge Gordy testified as follows:

> A:    The Court was under the impression based on the Motions and arguments throughout of the Defense that these persons' memory would be so vague and so scant that it would be impossible for - it would be unlikely that the State would be able to present much of a case and certainly the Defense would be incapable of mounting much of a Defense because of their lack of recollection and the great passage of time. At the conclusion of the testimony, having heard from Mr. House, Ms. Lewindowski and Ms. Farley, quite the opposite was true. These three young people who had been students of Mr. Merzbacher, and Mr. House had actually lived with Mr. Merzbacher for a period of time, their recollection of incidents and where this sexual contact had occurred, was amazingly clear. At the conclusion of that testimony when we adjourned into chambers, I initiated a question because it appeared that these young people, who are now adults, that their memory was good enough and emphatic enough that the State would not only be able to put on a case but what was likely to be a strong case.

(06-516, P. 4 Ex. 13 at 76-77.)

Moreover, the defense believed that its case was substantially weakened when it lost

Judge Gordy, a judge they perceived as favorable, and were transferred to Judge

Hammerman, a judge who they perceived to be highly unfavorable. Gutierrez testified:

> A: I found [Judge Hammerman] very difficult in terms of his rulings and the
> obtuseness with which he would do and this attention was always on little
> idiotic things. He would give no void dire, no credence to me or to Defense
> Counsel and particularly in the matter of voir dire, which I'd been through
> Judge Hammerman a number of times, in my view he didn't believe in giving
> any voir dire at all.
> . . . .
> Q: Would it be fair to say that probably you would not get a deal anywhere
> near as good as what Judge Gordy put on the table in this case had you gone to
> Judge Hammerman?
> A: That's correct.
> . . . .
> A: trial in front of Gordy was infinitely better than trial in front of
> Hammerman

(06-516, P. 4, Ex. 13 at 38-39, 40, 42.) There is no suggestion in the record that the parties

could not have gone back to Judge Gordy to consummate a plea agreement.

Furthermore, the plea bargain offered to Merzbacher was exceptionally generous.[17]

The plea would have disposed of all sixteen cases pending against Merzbacher in exchange

for only 10 years in jail. The offer was so generous that it made Judge Gordy feel "taken

aback:"

---

[17] Petitioner did testify that sometime during trial, counsel presented a plea offer to him
that he rejected. That offer, as testified to by petitioner, was not nearly as advantageous as the
pretrial offer. Merzbacher said that the offer was immediately before the verdict on the Murphy
case and offered "if I would plead guilty I would get - they would take half of what I got on the
Murphy case on all the other cases." (06-516, P.4, Ex. 12 at 88). Petitioner testified that he
rejected that offer because he was in the midst of trial. No other testimony regarding this offer
was elicited. Much later, the State's Attorney produced a note found in defense files which was

Q: Do you recall what it is you said that actually got this discussion under way?

A: I think I said to the State, had they made any offers in this case to the Defense in reference to a plea and I think that's what initiated this discussion which was not a long, all night discussion, but that initiated a discussion.

Q: And in response to your question, what did you hear?

A: The Assistant State's Attorney, who at that time was Ms. May, in the presence of Ms. Siskind said that the State had considered or would consider an offer of ten years in prison.

Q: What was your response to that ten year?

A: Shocked would be too strong a word but I was taken aback because I had just heard the testimony o f series and a number of sexual contacts between Mr. Merzbacher and these three students and allegations that they witnessed other contacts and activities and I was shocked that the offer was so–I was I wasn't shocked–surprised that the offer was so low in light of the testimony I had just heard.

. . . .

*Quite frankly, I thought it was an offer that, based on what I had just heard, Ms. Gutierrez should jump on it.*

(06-516, D. 4, Ex. 13 at 77-78) (emphasis added).

Finally, both of Merzbacher's attorneys believed that the plea offer was a beneficial arrangement for Merzbacher. Gutierrez said "I would say in my view it was somewhere between ok and good. . . . I'd put it not quiet good but as good as it's going to get. That's how I viewed it." (06-516, D. 4, Ex. 13 at 35-36). Kanwisher felt more strongly about the benefits of the plea deal. He said "I thought it was a good deal and a fair deal for him. . . And quite honestly, in my view, I think that we should have probably urged him to take it." *Id.* at 73.

---

not admitted into evidence.

For all of these reasons, there is more than a reasonable probability that Merzbacher would have taken the plea agreement if he was provided that opportunity.

All parties agree on the approximate contours of the plea agreement: Merzbacher would plead guilty and be sentenced to ten years in jail, and the state would nol prosse the cases Merzbacher did not plead guilty to. Although it is unclear if the plea would have been an *Alford* plea (Judge Gordy indicated that he would not have accepted an such a plea) or a straight guilty plea, the evidence clearly indicates a sufficiently well-defined offer so that Merzbacher is entitled to the benefit of this bargain.

Assistant State's Attorney Siskind's testimony shows that the State was ready to make a deal on the plea agreement without much additional negotiation. Her testimony indicates that Merzbacher could have accepted the plea agreement immediately – and with a few tweaks regarding which cases would be nol prossed and which cases would get the guilty plea – the case could have been over.

> Q: Ms. Siskind, there's no question in your mind though that the State conveyed a plea agreement to the Defense. Is that correct?
> A: I don't know–I don't really know how to characterize this because it was more of a way of starting a discussion but yes, we said–the Judge said to us, what amount of time are you thinking of? We said ten years for a group of cases if he plead guilty to them.
> Q: And had Mr. Merzbacher been present and walked in to the room that day and said, yes, I agree to enter a plea of guilty and accept a ten year sentence, the plea would have been consummated at that time, correct?
> A: Well, I think there would have been a little more. We would have had to sit down and decide exactly which ones he would have been pleading to, but yes.
> Q: And as a result of that plea, it would have eliminated all of the cases?
> A: Correct.

(06-516, P. 4, Ex. 12 at 61-65).

The testimony from Kanwisher, Gutierrez, and Judge Gordy corroborate Siskind's testimony that the plea negotiation was reasonably clear and could have been complete after a few details were determined.

Judge Gordy testified as follows:

Q: And had Mr. Merzbacher entered a plea of guilty in the Murphy case as was offered by the State with a ten year cap, since you had discussed that, is it correct to say that you would have accepted that plea, a plea of guilty with the ten years?
A: I think so. Reluctantly but I think so.
Q: But you would have accepted it?
A: I think so....
Q: No. 10 years. You're correct. You're characterization is a guilty plea to 10 years?
A: Yes.
Q: And I noticed that you called, you classified it, to use your words, a good deal, "Ten years was a good deal in this case."
A: He was looking at life plus.
. . . .
A: . . . I can only answer your questions as to whether or not I would have accepted an Alford plea in this case is; I don't know.
Q: But would you have accepted a guilty plea to ten years?
A: Yes.
Q: You have no question about that?
A: No doubt about it.

06-516, Paper No. 4, Ex. 13 at 75-100.

Kanwisher testified to the same effect:

Q: And what was your understanding of the plea that was being offered by the State to the Defense?
A: Well, the State was proceeding upon a case involving an alleged victim called Elizabeth Murphy. . . And ultimately the plea was that Mr. Merzbacher, if he chose to, would plead guilty to the Elizabeth Murphy case, receive a sentence of ten years, and all the remaining cases would be nol prossed. And that was my understanding of the plea offer.

Q: Now, as a defense attorney, you're aware of the difference between plea negotiations and a plea offer, are you not?
A: Yes
Q: And, in this instance, how would you characterize the result of your discussions? Were they a plea offer or plea negotiations?
A: It was an offer[.]

06-516, P. 4, Ex. 12, pg. 58-60.

Gutierrez's testimony is similar:

A: It was a plea to one, I think it was one Count, it might have been two Counts, to rape and child abuse in the Liz Murphy case for ten years. And that all of the other cases, however many there were, fifteen or sixteen of them would all be nol prossed.
Q: Now, as a criminal defense attorney, did you interpret this to be a firm offer made by the State to you?
A: Yes.
Q: These weren't plea negotiations or anything else that had to be resolved. This, in your mind, was a firm plea offer, made in order to resolve, not only the Murphy case, but all of the other cases for which Mr. Merzbacher had been indicted at the time?
A: Yes.
Q: And that plea was made to you in whose presence?
A: I believe it was Ms. Siskind, Ms. May, Mr. Kanwisher and myself.
Q: Was Judge Gordy there at the time?
A: Yes.
Q: So there were five individuals who had personal knowledge of that plea?
A: Yes.

06-516, P. 4, Ex. 12, pg. 21-22.

It is clear to this court that Merzbacher has satisfied his burden to show that he suffered the constitutional wrong complained of and that he is entitled to relief.

C. Remedy

The court must fashion a remedy for the violation found that is fully congruent with the scope of the wrong. "[W]here there has been a finding of ineffective assistance of counsel

in a [habeas] proceeding, the remedy 'should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.'" *United States v. Gordon*, 156 F.3d 376, 381 (2d Cir. 1998) (quoting *United States v. Morrison*, 449 U.S. 361, 364 (1981)). Moreover, "the necessity for preserving society's interest in the administration of criminal justice," is among those interests. *United States v. Day*, 969 F.2d 39, 47 (3d Cir. 1992). The appropriate remedy "is one that as much as possible restores the defendant to the circumstances that would have existed had there been no constitutional error." *United States v. Carmichael*, 216 F.3d 224, 227 (2d Cir. 2000).

Merzbacher stands convicted of child rape, a crime both hideous and heinous. But like all persons charged with crime in our society, he was entitled to the protections of the Sixth Amendment, of which the court has found he was unconstitutionally deprived. Understandably, he asks that the court order him released from prison because he has served well in excess of the ten year sentence he would have received had the offer of a plea agreement been pursued and consummated as contemplated. But he is only entitled, constitutionally, to be "restore[d] . . . to the circumstances that would have existed had there been no constitutional error." It is clear to the court that those circumstances required two essential things: (1) a fully negotiated plea agreement with the state and importantly, (2) the willingness of a judge on the Circuit Court for Baltimore City to accept that plea agreement. In short, the court can find no basis in the record of this case or in law to order a remedy that far *improves* the circumstances Merzbacher faced at the time he suffered his constitutional wrong.

## V. CONCLUSION

In conclusion, Merzbacher is entitled to relief from this court because the state post-conviction court engaged in a patently defective factfinding process leading it to stray from its task of evaluating whether he is entitled to relief. For the reasons outlined herein, the court is constrained to conclude that the correctness of the state post-conviction court's findings of fact have been shown to be grossly incorrect and that that court reached a determination that was manifestly unreasonable. "It is [this court's] obligation in habeas corpus to defer to the state courts, not to clean up after them." *Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000) (Rovner, J., dissenting). Accordingly, the court will enter an order directing the State of Maryland to return this prosecution to the status quo ante within 60 days. That is to say, the state shall afford Merzbacher an opportunity to accept its prior offer of a plea agreement. Before Merzbacher gains full relief, a judge of the Circuit Court for Baltimore City must express his or her willingness to carry out the undertaking of his or her former colleague, who bound himself, but perhaps not the court as a whole, to impose a sentence of ten years incarceration should Merzbacher elect to plead guilty.


Filed: July 30, 2010                                    _____/s/_____
                                                       Andre M. Davis
                                                       United States Circuit Judge
                                                       (By Designation)